**HENDRICKS MUSIC COMPANY, an Illinois corporation, Plaintiff,**

v.

**STEINWAY, INC., d/b/a Steinway & Sons, a Delaware corporation, Defendant.**

**No. 87 C 10582.**

United States District Court, N.D. Illinois, E.D.

June 24, 1988.

---

James K. Gardner, George M. Hoffman, Neal Gerber Eisenberg & Lurie, Chicago, Ill., for plaintiff.

John T. Cusack, Petery J. Meyer, Mary-Beth Cyze, Gardner, Carton & Douglas, Chicago, Ill., William E. Davis, Steinway Musical Properties, Inc., Newton, Mass., Bruce D. Skoler, Mintz, Levin, Cohn, Ferris, Glovsk & Popeo, Washington, D.C., for defendant.

## MEMORANDUM OPINION
## AND ORDER

HART, District Judge.

### BACKGROUND

Plaintiff Hendricks Music Company ("Hendricks") brought this action against defendant Steinway, Inc. ("Steinway") alleging that Steinway's conduct in seeking to terminate Hendricks' Steinway dealership because of Hendricks' agreement to handle the concert and artist ("C & A") program of Yamaha Music Corporation ("Yamaha") constitutes an exclusive dealing agreement, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[1] Hendricks moved for a preliminary injunction to enjoin the termination of its dealership, originally scheduled to take place on January 19, 1988, pending a trial on the merits. Steinway and Hendricks agreed to maintain the *status quo* pending a ruling on Hendricks' motion. The motion was referred to the assigned magistrate, who conducted a six-day hearing and then issued a thorough and detailed report recommending that Hendricks' motion be denied. Hendricks has now filed objections to the magistrate's report and recommendation; Steinway has also filed limited exceptions to a portion of the report.

The magistrate's recommended findings of fact in this case are not substantially disputed by either party.[2] What *are* disputed are the recommended conclusions of law. Pursuant to 28 U.S.C. § 636, therefore, these conclusions must be examined *de novo*, but this *de novo* legal review does not necessitate that a new hearing be conducted; an examination of those portions of the record referred to by the parties in their written submissions to the court is alone sufficient. *United States v. Raddatz*, 447 U.S. 667, 673–76, 100 S.Ct. 2406, 2411–13, 65 L.Ed.2d 424 (1980).

■ The party seeking a preliminary injunction bears the burden of establishing five requirements for the issuance of such an injunction:

(1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest.

*Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988). The magistrate concluded that Hendricks has met its burden of establishing that it has no adequate remedy at law, that it will suffer irreparable harm if the preliminary injunction is not issued, and that the injunction will not harm the public interest. The magistrate found, however, that the two remaining elements—concerning the balance of harms and the likelihood of success on the merits—have not been established; accordingly, she recommended that the motion for a preliminary injunction be denied.

Hendricks objects to four separate aspects of the magistrate's conclusions, each of which will be addressed fully below. First, Hendricks objects that the magistrate's assessment of the balance of harms treats competition itself as a harm to be prevented—an assumption which, Hendricks urges, runs directly contrary to the purposes of the antitrust laws. Second,

---

**1.** The complaint also alleges various other claims under federal and state law, but none of those are at issue in the present posture of the case.

**2.** The factual background of the case is adequately set forth in the magistrate's report and will not be repeated here except to the extent necessary to address the parties' objections and exceptions. The magistrate's report is attached to and made a part of this opinion and order.

and related to this, Hendricks contends that the magistrate's assessment of the probable effects of Steinway's conduct on Yamaha's ability to enter the market is contradicted by her assessment of the potential for irreparable harm to Steinway if the injunction is granted. Third, Hendricks argues that the magistrate premised her assessment of Hendricks' likelihood of success on its ability to prove the existence of an "essential facility" and that in so doing, she misconceived applicable law and overstated Hendricks' burden. Finally, Hendricks claims that the magistrate misapprehended the standard for finding monopolization by failing to find concert grand pianos (or a putative market for C & A services) to be the relevant product market and by requiring that "market share" be the "source" of the exclusionary power.

Steinway, while concurring generally with the magistrate's report, takes limited exception to two aspects of her analysis. Steinway first takes issue with the magistrate's conclusion that, absent an injunction, Hendricks will suffer irreparable injury and not have an adequate remedy at law. Steinway also contends that the magistrate erred in concluding that nine-foot concert grand pianos constitute a distinct product submarket in which Steinway has market power.

After reviewing the report and recommendation, the parties' objections to the report, and the record of the case, this court denies both the objections of Hendricks and the limited exceptions of Steinway, adopts the magistrate's report in full, and denies Hendricks' motion for a preliminary injunction.

## DISCUSSION

### Likelihood of Success on the Merits

■ In order properly to evaluate the parties' objections to the magistrate's report and recommendation, which focus largely on the issue of Hendricks' likelihood of success on the merits, the court must separately examine the magistrate's analysis with respect to each of the antitrust violations alleged. The first of these is Section 3 of the Clayton Act,[3] which makes it unlawful to sell goods on the "condition, agreement, or understanding" that the purchaser "shall not use or deal in" the goods of a competitor of the seller, where the effect of such condition, agreement or understanding "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." The second violation alleged involves Section 2 of the Sherman Act, which simply prohibits unilateral "monopolization."

### Section 3 Clayton Act Claims

In *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984), the Seventh Circuit analyzed the elements of a violation of Section 3 of the Clayton Act: (1) the existence of an agreement, albeit not necessarily an explicit one, between the manufacturer and the dealer that the dealer not handle competing goods; and (2) a showing that the agreement is likely to have a substantial anticompetitive effect in the relevant market. *Id.* at 392. Relying heavily on *Roland*, the magistrate in this case found (and Steinway does not object to this finding) that Hendricks (unlike the plaintiff in *Roland*) can establish the probable existence of an agreement, and thus satisfy the first element under Section 3. The magistrate concluded, however, that Hendricks is *not* likely to satisfy the second element of Section 3—a substantial anticompetitive effect.

### The Relevant Market

■ In reaching her conclusions with respect to Section 3 of the Clayton Act (and

---

**3.** The analysis with respect to Section 3 of the Clayton Act applies equally to the claims raised under Section 1 of the Sherman Act, which require a plaintiff to demonstrate the existence of a relevant market and the existence of a contract, combination in the form of trust or otherwise, or conspiracy which has the effect of foreclosing competition in a substantial share of the relevant market. *See Havoco of America,*

*Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir.1980). Hendricks has nowhere suggested that its claims under Section 1 of the Sherman Act can stand if its claims under Section 3 of the Clayton Act fail. Therefore, although the discussion here focuses on Section 3 of the Clayton Act, it is also dispositive of Hendricks' Section 1 Sherman Act claims.

Section 1 of the Sherman Act), the magistrate defined the "relevant market" as the manufacture and sale of all acoustic pianos in the United States. Although she concluded that the manufacture and sale specifically of concert grand pianos constitutes a distinct product *submarket* for antitrust purposes (a finding to which Steinway, as discussed below, takes exception), she determined that that submarket is not itself the relevant market for purposes of evaluating the impact of Steinway's dealer restrictions on competition. The magistrate also rejected altogether Hendricks' argument that there exists a "market" in any recognizable sense at all for C & A pianos and services, focusing on the fact (clearly borne out in the record) that neither Steinway nor Yamaha views its C & A program as a product (or even necessarily as a discrete service), but rather, as a promotional tool for the sale of acoustic pianos *generally*.[4]

Having thus defined the relevant market as the market for acoustic pianos generally, the magistrate determined (and the parties do not dispute) that Steinway controls only a 1.75% share of *that* market. The record also indicates that Steinway's share of the submarket in concert grand pianos is at least 48% in unit volume—clearly a sufficient share to permit an inference of market power. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). As noted above, however, *this* market share was not considered by the magistrate to be important since, in her view, the relevant market is the market in acoustic pianos generally, and not just the submarket in concert grands.

Consistent with her determination that no relevant market in C & A pianos and services can be defined in any meaningful sense, the magistrate was unable to arrive at any conclusion as to what "share" of

any such putative "market" Steinway could be said to control. The evidence does show that Steinway dominates the classical concert stage, but it also indicates that Steinway artists use C & A pianos for only 20–25% of their performances. Even Hendricks concedes that when the piano supply and rental business as a whole is considered, Steinway occupies an insignificant place in it. Numerous sources exist for loaned and rented pianos, and there is no suggestion in the evidence that Steinway C & A pianos are usually, or even frequently, the instrument of choice for musical events generally. The magistrate was correct when she stated:

> To define a market which Steinway dominates, one would have to define a market for the supply and service of performance pianos played by Steinway artists performing at concert venues which do not use their own Steinway pianos. This court has substantial doubt that a relevant market can be defined in such a "gerrymandered" fashion.

This court thus concurs with the magistrate's conclusion that the relevant market in this case for purposes of analysis under Section 3 of the Clayton Act (and Section 1 of the Sherman Act) is the manufacture and sale of *all* acoustic pianos (in which Steinway has less than a 2% market share) and not, as Hendricks contends, a putative market for either concert grand pianos or C & A services (where Steinway's presence is significantly larger). With the relevant market thus defined, the conclusion is inescapable, as the magistrate found, that within that market, Steinway's conduct is not likely to have a "substantial anticompetitive effect."

Hendricks complains that the magistrate, having found the probable existence of a separate product submarket for concert grand pianos, should also have concluded that such pianos constitute the relevant market for purposes of analyzing the im-

---

**4.** Significant in this regard is the fact that Steinway recovers only the costs of its C & A program. Yamaha plans to determine on a case-by-case basis whether to recover its C & A costs or to bear them itself.

pact of Steinway's conduct on competition. Hendricks points out that the volume of sales of all concert grand pianos, and particularly of those made by Steinway, is substantial. For example, in 1986, Steinway, through its dealers, sold approximately 140 concert grands at an average price of $25,000, amounting to revenues to Steinway of $3,500,000 from such wholesale sales. Steinway also apparently sold, and still sells, a number of concert grand pianos directly from its own retail outlet in New York City, at approximately $43,000 each. Hendricks also points out that Steinway receives substantial revenues by providing its concert grands through its C & A program (more than $1 million a year from its New York C & A program and approximately $280,000 from its dealer-operated C & A programs). Adding these figures, Steinway's revenues from either the sale or lease of concert grand pianos for concert performances amounts to approximately $5 million per year, representing at least 15% of its total annual revenues of $33 million. As Hendricks properly points out, the size of this market is hardly insignificant.

■ Hendricks cites *Sargent–Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), for the proposition that a small submarket of a larger product market may itself constitute a relevant market for antitrust purposes. But Hendricks' argument on this point overlooks the undisputed fact that, for both Steinway and Yamaha, the putative markets in concert grand pianos and in C & A services exist essentially only as a means to create a public perception that their respective pianos are the choice of artists. In so doing, they hope to convince the public of the prestige and quality of their respective brands, with the ultimate objective of promoting sales in the market for acoustic pianos generally. *Sargent–Welch* itself makes clear that in determining what

constitutes a relevant market for antitrust purposes, the goal is to "delineate markets which conform to areas of effective competition and to the realities of competitive practice." *Id.* at 710 (citing *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir.1971)).

*Sargent–Welch* [5] involved a manufacturer of precision balances who had only an 8.2% share in the overall market for precision balances but a 90% share in a specialized submarket for electromagnetic microbalances. The electronic microbalances constituting the submarket were typically purchased only by technically sophisticated customers for specialized applications. They followed a price structure apparently unrelated to the price structure for ordinary precision balances, and the demand for them had been found to be relatively insensitive to price changes.

In these respects, the electronic microbalances in *Sargent–Welch*, which the court found to constitute a wholly distinct relevant market for purposes of antitrust analysis, are similar to the concert grand pianos involved in this case, with their specialized buyers, low price elasticity, and unique physical characteristics. The crucial distinction, however, is that when the manufacturer in *Sargent–Welch* introduced its electronic microbalances, "it saw itself appealing to a new end-user market." *Id.* at 771. Here, by contrast, as already noted, it is clear that concert grand pianos and C & A services are viewed by both piano manufacturers not primarily as products or services at all, but rather, as promotional tools to promote their positions in the overall acoustic piano market. (In fact, it is clear that this was a primary factor motivating the development of Yamaha's new concert grand, the CF–III.) It is this *overall* market, therefore, that constitutes the "area[ ] of effective competition," as enunciated in *Sargent–Welch*, between Steinway and Yamaha in this case. Hendricks' objection to the magistrate's conclusion

---

**5.** *Sargent–Welch* actually arose under Section 2 of the Sherman Act (the monopolization provision) rather than under Section 3 of the Clayton Act, but for purposes of this analysis of markets and submarkets, the distinction is irrelevant.

that acoustic pianos as a whole—rather than just concert grand pianos (or C & A services)—constitutes the relevant market, is without merit.

■ In this same connection, Steinway has taken limited exception to the magistrate's treatment of concert grand pianos in defining the relevant market. Specifically, although Steinway concurs with the magistrate's determination that concert grand pianos do not constitute the relevant market for antitrust analysis, it contends that the magistrate erred in her subsidiary finding that such pianos may constitute at least a distinct submarket. Steinway argues that there are no distinct buyers or sellers of concert grand pianos, that no manufacturer makes only a nine-foot concert grand, that no dealer sells only nine-foot concert grands, that manufacturers advertise concert grands along with smaller grands and other pianos, that pianists play on more than one type of piano, that there are no barriers to entry to the manufacture of concert grands, and that concert grands compete even with non-acoustic pianos.

Given the magistrate's conclusion that Steinway's 48% share of the concert grand piano submarket is not the controlling feature for purposes of antitrust analysis, her finding that there is a likely distinct submarket in concert grands (and Steinway's objections to this finding) does not affect the overall analysis under Section 3 of the Clayton Act. Nevertheless, the court notes that Steinway's limited exceptions on the submarket issue are without merit. There can be little question but that under *Sargent–Welch*, as discussed above, concert grand pianos satisfy the criteria for a recognizable submarket, even if not for the *overall* relevant product market for antitrust purposes. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962). Approximately 250 concert grand pianos were sold in the United States in 1986. The evidence established that while a small number of individuals may purchase such

pianos for residential use, the primary buyers are concert halls, institutions and concert artists, whose needs require specific qualities that can only be provided by a concert grand. Concert grand pianos cost more than other pianos, and prices can be raised significantly without causing consumers to seek substitutes. The evidence also shows that concert grand pianos have certain unique physical characteristics essential to their specialized functions, and that some piano manufacturers have separate production facilities for their manufacture.

The Seventh Circuit has identified the "uniqueness of the product's functions and therefore its uses" as the most important factor in delineating a relevant submarket. *Sargent–Welch, supra* at 710. Here, the evidence clearly establishes that there are functions and uses for which a concert grand piano is designed and for which no other type of piano can substitute. As the magistrate put it:

> A concert grand piano is designed to provide—and only a concert grand piano can provide—the power, volume and control essential for virtuoso piano performances and for all performances of a pianist with a symphony orchestra. Concert grand pianos are manufactured because such uses demand them, and for such uses, there are no substitutes.

Steinway's exceptions to the magistrate's determination that there exists a likely submarket in concert grand pianos (even though not a relevant overall product market) are therefore denied.

### The "Essential Facilities" Doctrine

■ Hendricks next objects to the magistrate's discussion of the "essential facilities" doctrine, arguing that the doctrine is altogether inapplicable to the Section 3 Clayton Act (and Section 1 Sherman Act) claims at issue in this case. Hendricks is correct that the "essential facilities" doctrine does not apply in the circumstances of this case, but, as discussed below, a review of the report shows that the magistrate did

not, in fact, treat the "essential facilities" test (or, more precisely, Hendricks' apparent inability to satisfy it) as the basis (or, at least, as the sole basis) for her conclusion that Hendricks has not established a likelihood of success on the merits.

■ As Hendricks points out in its objections, and as the magistrate herself noted, the "essential facilities" doctrine usually arises only in connection with claims under Section 2 of the Sherman Act (for monopolization); it imposes an affirmative duty, in certain circumstances, upon a monopolist with control over an "essential facility," to share that facility with its would-be competitors. A refusal to do so may be unlawful "because a monopolist's control of an essential facility ... can extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). *See also Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024 (7th Cir.1988); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376 (7th Cir.), *reh. denied,* 802 F.2d 217 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). Hendricks properly points out that the circumstances under which the "essential facilities" doctrine can successfully be invoked are rare and are largely confined to situations where physical conditions virtually prohibit the obtaining of duplicate or comparable facilities.

Although Hendricks now apparently concedes that it cannot satisfy the requirements for application of the "essential facilities" doctrine in this case, it complains that the magistrate erred in even considering the doctrine. Hendricks' argument here is perplexing, however, since the magistrate's treatment of the "essential facili-

ties" doctrine appears to have been undertaken at the behest of Hendricks itself; Hendricks had explicitly argued before the magistrate that Steinway's conduct (i.e., its Section 3 Clayton Act "agreement") deprived Yamaha of access to certain "essential facilities" controlled by Steinway.[6] But regardless of the *reasons* the magistrate had for entertaining the "essential facilities" doctrine, it was discussed only as a possible *alternative* basis for liability; the magistrate's conclusion that Hendricks could not satisfy the requirements for prevailing under that doctrine plainly was *not* necessary to her overall determination that Hendricks was not likely to succeed in showing a substantial anticompetitive effect so as to prevail on its claims under Section 3 of the Clayton Act (or Section 1 of the Sherman Act).

That Steinway's conduct is not likely substantially to lessen competition in the market affected by the C & A program (i.e., the market for the manufacture and sale of all acoustic pianos), is readily apparent once the interrelationships among the various markets and submarkets involved are scrutinized, even without reference to the "essential facilities" doctrine. And even if a putative market for just concert grand pianos is viewed in isolation, no showing has been made that Yamaha, which clearly has the capacity (albeit only over time) to develop an independent dealer network and adequate supporting technical services, will be significantly hindered from challenging Steinway's dominance in that market.

Under *Roland,* a plaintiff seeking to establish the unlawfulness of an agreement under Section 3 of the Clayton Act must show "that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it." *Roland, supra* at 394. As the magistrate correctly inferred from the evidence presented:

> The fact is that the introduction by Yamaha of a Yamaha C & A program in

---

**6.** As the magistrate noted, Hendricks was not altogether consistent in what it identified as these putative "essential facilities." Hendricks had variously identified these facilities as Steinway's network of dealers (with their C & A pianos and services), Steinway's pool of piano technicians, and the Steinway artists themselves.

Chicago will, if Hendricks cannot represent both Yamaha's and Steinway's programs, result in the existence of two competing C & A dealers. This will not only give artists a choice of dealers, along with a choice of pianos, but it will create real competition for the placement of C & A pianos at musical events, competition that would not exist if Hendricks controlled both programs....

Having Yamaha's and Steinway's major promotional programs in competing dealerships will almost certainly result in the more vigorous promotion of each program.... With both manufacturers vigorously represented by competing dealers in a major market like Chicago, and with each manufacturer responsible for promoting its own line and its own dealer, the most likely effect is expansion of piano sales and the creation of a larger and more vigorous marketplace.

Since the magistrate did not need to resort to the "essential facilities" doctrine in order to find that Hendricks has failed to establish a likelihood of success on the merits of its Section 3 Clayton Act (and Section 1 Sherman Act) claims, Hendricks' objections relating to the magistrate's treatment of the "essential facilities" doctrine are denied.

### Section 2 Sherman Act Claims

Hendricks' objections to the magistrate's treatment of its monopolization claims under Section 2 of the Sherman Act are twofold. Hendricks first reiterates its objection that the magistrate erred in concluding that the market for concert grand pianos, while constituting a distinct product submarket, does not constitute the relevant overall product market for purposes of antitrust analysis. This objection has already been discussed above, in connection with Hendricks' claims under Section 3 of the Clayton Act, and as set forth in that analysis, under *Sargent–Welch*, it is without merit. That leaves for consideration only Hendricks' second objection to the magistrate's monopolization analysis: Hendricks'

claim that the offense of monopolization does not require that the defendant's dominant market share be the "source" of the exclusionary conduct at issue.

■ The offense of monopolization under Section 2 of the Sherman Act requires proof of monopoly power "plus conduct designed to maintain or enhance that power improperly." *Olympia Equipment, supra* at 373. The magistrate found that Steinway's share of almost 50% of the submarket for concert grand pianos is sufficient to permit an inference of market power in that submarket, but that such a market share is not the source of Steinway's ability to exclude competition by Yamaha's C & A program. The magistrate found that what gives Steinway leverage over its dealers is rather its good name and reputation, deriving from its historic superiority and its own artists roster.

Hendricks concedes that Steinway's market power in concert grand pianos was lawfully acquired, and the law is clear that a firm with lawful monopoly power has no general duty to help its competitors. *Olympia Equipment, supra* at 375. Hendricks maintains, however, that Section 2 of the Sherman Act prohibits not only the *use* of market power for improper ends, but also the *maintenance* of such power by methods that are exclusionary in purpose or effect. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Specifically, Hendricks argues that: (1) Steinway has a monopoly in concert grand pianos, a monopoly that Yamaha is threatening with the introduction of its new CF–III; and (2) Steinway is *maintaining* that monopoly (and along with it, its prestige in the broader market and its position in the "hearts and minds of concert artists") by *exclusionary means* (threats to terminate dealers who cooperate with Yamaha's C & A program) that have been adopted for *exclusionary purposes* (to prevent Yamaha from obtaining services that will enable it to sell the use of its CF–IIIs to outstanding concert artists, whose adoption

of that instrument will enable Yamaha to enhance its position in the larger acoustic piano market).

▮ It is true, as Hendricks points out, that certain exclusionary means that might conceivably be legitimate for a non-monopolist are forbidden to one who has monopoly power, even if only in a submarket. *Sargent–Welch, supra* at 711–12. But Hendricks' argument is beside the point, because no showing has been made that Steinway really *has* monopoly power—defined as the power to control prices or exclude competition, *see United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)—even in the limited submarket for concert grand pianos. That Yamaha plans to sell its CF–III for $10,000 more than the most-closely-equivalent Steinway nine-foot concert grand sells for shows that Steinway does not have the power to control prices. And nothing in the evidence suggests that Steinway has done or can do anything to impede Yamaha's ability to capture a share of the concert grand piano market once Yamaha offers a competitive instrument for sale. There is no indication that Steinway has attempted to discourage its dealers from selling the CF–III, and all the evidence indicates that the market for concert grands is one with relatively insignificant barriers to entry.

Given Steinway's inability to control prices or exclude competition even in the putative submarket for concert grand pianos, where it controls a nearly 50% market share,[7] its lack of monopoly power in the *overall* acoustic piano market—which the magistrate correctly determined to be the *relevant* product market and in which Steinway has only a 1.75% share, is readily apparent. Hendricks' objections to the magistrate's analysis under Section 2 of the Sherman Act are without merit.

*Irreparable Injury and the Balance of Harms*

▮ The remaining objections to the magistrate's report and recommendation go primarily to the magistrate's assessment of the "balance of harms" and to her overall application of the standards for determining whether the issuance of a preliminary injunction is warranted in the circumstances of this case. Hendricks focuses specifically on the magistrate's statement that "it [Hendricks] has clearly demonstrated a fair ground for litigation" (even though the magistrate ultimately concluded that it had not demonstrated a likelihood of success on the merits); Hendricks also points to the magistrate's recognition that its loss of the Steinway line will irreversibly change its business and "substantially diminish it and damage it in ways that are not susceptible to quantification." Hendricks argues that such statements contained in the magistrates's analysis cannot be squared with her conclusion that the "balance of harms" tips in favor of Steinway. Steinway, on the other hand, while concurring generally with the magistrate's determination that it (Steinway) will be more seriously and irreparably injured by the erroneous entry of a preliminary injunction than Hendricks would be hurt if the injunction were denied, argues that the magistrate still overstated the potential for harm to Hendricks—which harm, Steinway claims, will be minimal. As discussed below, both parties' objections to the magistrate's analysis here are without merit.

Steinway's contention that Hendricks will not, in fact, suffer irreparable injury (and that Hendricks does not lack an adequate remedy at law) can be disposed of first. In this regard, it is true that the evidence shows that the loss of Hendricks' Steinway dealership will not put Hendricks out of business, and that even without

---

**7.** Hendricks maintains that Steinway also has a monopoly in the market for C & A services given its dominant position in supplying concert-ready pianos for performances by leading concert artists. As previously discussed, however, it is doubtful whether an identifiable "market" in C & A services can be delineated at all given the undisputed fact that both Steinway and Yamaha regard their C & A programs not as products or even really as services, but strictly as promotional tools to further overall acoustic piano sales.

Steinway, Hendricks will remain solvent and able (with some help from Yamaha) to finance this litigation. The law is clear, however, that a plaintiff need not demonstrate that its total business will be destroyed in the absence of a preliminary injunction in order to establish irreparable injury. *See, e.g., General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 591 (7th Cir.1984) (irreparable injury found where denial of injunction "might be a grievous, though probably not lethal blow"). *See also Sealy Mattress Co. of Michigan, Inc. v. Sealy, Inc.,* 599 F.Supp. 1494, 1503 (N.D.Ill.1984), *rev'd on other grounds,* 789 F.2d 582 (7th Cir.1986) (irreparable injury found where plaintiff stood to lose only 16–20% of total sales). Here, approximately 40% of Hendricks' sales during its last fiscal year were of new Steinway pianos, and Steinway accounts for more sales of new pianos than either Yamaha or Samick, the other piano brands Hendricks carries. The evidence shows that Hendricks stands to lose approximately $1.6 million in sales of new Steinway pianos annually; Hendricks will also experience an unquantifiable loss of sales of its Yamaha and Samick pianos if it is forced to lose the drawing power of the Steinway name. In addition, it will no longer be able to sustain all of its four locations or its 32 skilled employees (though the exact extent of this anticipated loss is difficult to determine from the record).

Steinway points to the fact that Hendricks recently opened three stores in the Minneapolis area, none of which carry the Steinway line, and that those stores do not appear to be suffering. A closer review of the record indicates, however, that Hendricks' Minneapolis stores are not expected to show a profit for at least two or three years. Hendricks' Chicago stores, on the other hand, have been built and centered around the Steinway piano, at considerable expense to Hendricks.

The fact that Hendricks' relationship with Steinway has been longstanding, dating back to 1974, makes this case different from *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.,* 604 F.2d 755 (2d Cir.1979), cited by Steinway for the proposition that the only potential loss to a terminated piano dealer is lost sales which can be adequately quantified in dollars and remedied by money damages. In *Jack Kahn,* the plaintiff was terminated from its dealership—described as only "tentative and exploratory" in any event—after just 1½ years. Here, by contrast, the evidence shows that Hendricks' entire business and reputation have been based on the prestige of the Steinway line. The loss of goodwill Hendricks will suffer if it must discontinue carrying that line is thus alone significant and impossible to quantify. Contrary to Steinway's assertions, therefore, the magistrate properly determined that loss of the Steinway dealership will cause irreparable harm to Hendricks.[8]

 Although the magistrate thus properly found that Hendricks will suffer irreparable injury (and lack an adequate legal remedy) if the injunction is improperly denied, she also found, as noted above, that Steinway would suffer irreparable harm if the injunction were granted, and that the *overall* balance of harms weighs in Steinway's favor. Hendricks objects, however, that the magistrate's findings regarding irreparable harm to Steinway cannot be reconciled with her findings regarding Hendricks' likelihood of success on the merits. Thus, Hendricks argues, one of the two findings must necessarily be wrong, and in either case, a preliminary

---

8. Steinway also makes the argument that to the extent the injury to Hendricks will be irreparable, such injury would occur regardless of the reason for the termination. Steinway points out that its dealership agreement with Hendricks, by its terms, is terminable "for any reason" upon 60 days written notice. This argument is misplaced because it overlooks the fundamental principle that a dealer termination for improper reasons may be enjoined (assuming all the requirements for the issuance of an injunction are satisfied) even though the dealership may be terminable for proper reasons. Otherwise, a preliminary injunction could never issue in a dealer termination case.

injunction is warranted. This argument, however misconceives the distinction between the merits and harm, and cannot be accepted.

For the reasons already discussed, it is unlikely that Hendricks will ultimately be able to prove that Steinway's conduct constitutes either (1) an unlawful agreement under Section 3 of the Clayton Act (or Section 1 of the Sherman Act); or (2) monopolization under Section 2 of the Sherman Act. These "merits" issues are entirely separate from—and consistent with—the inference that Steinway will be irreparably harmed by the divided loyalties that Hendricks can be expected to display if it is permitted to handle the two competing C & A programs. The magistrate's findings with respect to harm to Steinway focus not on protecting Steinway *from* competition from Yamaha, but on preserving Steinway's ability to compete *with* Yamaha in the all-important Chicago market. Steinway is wholly dependent on the efforts of its network of exclusive independent dealers to promote its name and its product line. Steinway's chief promotional tool has been and is its C & A program, and it may reasonably insist on its dealer's agreements to fully and vigorously implement that program. The magistrate properly concluded that allowing the existence in one dealership of two competing C & A programs could create conflicts of interest within the dealership in attempting to represent the two different programs.

Hendricks claims that Steinway's conduct was calculated specifically and solely to obstruct Yamaha's plans to become a major force with a rival C & A program, and it argues that the purpose with which a restraint is adopted is significant evidence of its probable effect. The law is clear, however, that "if conduct is not objectively anticompetitive, the fact that it was motivated by hostility to competitors ... is irrelevant." *Olympia Equipment, supra* at 379.

Hendricks also claims that Steinway's tactics have already succeeded in depriving Yamaha of the cooperation of its most reliable dealers in seven of the 22 markets which Yamaha targeted for the first phase of its C & A program. But the flip side to this is that Steinway's demand for exclusivity has not prevented Yamaha from establishing its C & A program in the other 15 of those 22 markets. Yamaha's ostensible need to create an instantaneous network of dealers around the country who can provide its C & A services is belied both by its own phased-in planning for the development of its C & A sites and by the fact that it has already signed up a number of artists (for example, and most notably, Andre Watts) based on the C & A sites it presently has available. Hendricks also has no response to the point that the introduction of Yamaha's C & A program by dealers other than Steinway dealers will promote competition among those dealers. Hendricks' contention that the magistrate's findings on likelihood of success conflict with her findings on harm to Steinway is thus unsupportable.

The Seventh Circuit has adopted a "sliding scale" approach to determining the propriety of issuing a preliminary injunction. Under this approach, first explicitly described in *Roland,* the benefit of injunctive relief can be determined by combining the probability of success on the merits with the magnitude of harm to the plaintiff. "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland, supra* at 387. *See also Curtis v. Thompson,* 840 F.2d 1291 (7th Cir.1988); *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1340 (7th Cir.1987); *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1432–36 (7th Cir.1986); *American Hospital Supply Corp. v. Hospital Products, Ltd.,* 780 F.2d 589 (7th Cir.1986).

The record before the court is fully developed, and on this record, as already discussed, it appears extremely doubtful that Hendricks will be able to succeed in establishing that Steinway's conduct is in viola-

tion of any provision of the antitrust laws. To counterbalance this very low likelihood that Hendricks can succeed on the merits, Hendricks would need to show that the overall balance of harms weighs *heavily* in its favor. This it has not done. As the magistrate correctly concluded, though the harm to be suffered by Hendricks if the injunction is improperly denied is significant, the harm to be suffered by Steinway if the injunction is granted is at least equally so:

> Steinway's problem ... is not simply that it faces being tied into an irrevocable dealership with a dealer with whom it no longer wishes to do business. Its problem is that it faces such a possibility in the third most significant music market in the nation, under circumstances in which it needs, perhaps as never before, its dealer's undivided loyalty and commitment, and when it has a very sound basis for believing that it cannot get that undivided loyalty and commitment from Hendricks.

Hendricks argues that the magistrate's conclusion as to the greater harm Steinway will suffer if the preliminary injunction is granted rests on the improper assumption that Steinway must somehow be protected from lawful competition by Yamaha. But this claim is not substantiated either by a reading of the magistrate's report or by a review of the evidence. As previously discussed, the magistrate's findings with respect to harm to Steinway focus not on protecting Steinway *from* competition from Yamaha, but on preserving Steinway's ability to compete *with* Yamaha in the all-important Chicago market.

The record here reflects that Hendricks already has closely aligned itself with Yamaha and that, because of this, it may no longer be able to give its undivided loyalty to Steinway. Hendricks is already receiving substantial financial assistance from Yamaha. It is reasonable to conclude, as the magistrate did, that Hendricks will be more inclined to promote the Yamaha line during the pendency of this case because a

loss will mean that it will be almost totally dependent on Yamaha. Moreover, because of Steinway's system of exclusive dealerships, it cannot rely on the presence of another dealer in the Chicago market to act as a competitive spur and counteract any lack of vigor on the part of Hendricks in its promotion of the Steinway line. The harm to Steinway from the issuance of the injunction, therefore, lies *not* as Hendricks claims in the potential loss of sales to Yamaha as a result of legitimate competition, but rather, in the denial to Steinway of a devoted dealer in one of its most critical markets. As Steinway points out, and as the magistrate concluded, it is perfectly legitimate, and, in fact, procompetitive, for manufacturers to insist that their dealers devote their undivided loyalty to their products and not to those of their competitors. *Cf. Sally Beauty Co. v. Nexxus Products Co., Inc.,* 801 F.2d 1001 (7th Cir.1986).

Hendricks claims that no showing has been made of any economic efficiencies that will be served by restricting it to representing only one of the competing C & A programs, given the absence of any industry-wide practice of exclusive dealing. The evidence does show that Steinway's own dealers, including Hendricks, regularly handle other makes of pianos besides Steinway, and that Steinway also permits its dealers to cooperate with C & A programs of manufacturers other than Yamaha, such as Baldwin. The evidence shows, however, that Baldwin's program, which involves only an occasional concert service, is too insignificant to be deemed in actual competition with Steinway's. And, as noted, even in terms of dealing with ordinary piano consumers, the existence of two C & A programs in a single dealership creates a significant conflict. As the magistrate points out in her report, Steinway has obviously made a business decision in the past that it is willing to allow its dealers to sell other brands, even though the sales of those brands benefit from Steinway's advertising and reputation. But that it does not wish to give this free ride to Yamaha, in dealerships "spearheading" Yamaha's

attack on Steinway's reputation for classical concert preeminence, is a legitimate procompetitive response. A Steinway dealer can easily argue the special superiority of the Steinway even though he sells Yamaha pianos and despite the existence of a Yamaha C & A program and a roster of Yamaha artists. But if that dealer is providing C & A services for those Yamaha artists and promoting Yamaha C & A pianos for use at major public events, it is difficult to see how he or she can argue Steinway's superiority with any persuasiveness.

Hendricks also points out that no dealer has control over whether any concert pianist chooses to play on a Steinway or a Yamaha. But this argument ignores the fact that dealers are promoting and offering for sale *all* pianos. As the magistrate noted, "concert service is but a small part of what the Yamaha and Steinway C & A programs are about." In addition, the evidence clearly shows that dealers frequently are called upon to recommend pianos to institutions that do not involve Steinway's concert artists. Hendricks' objections are without merit.

IT IS THEREFORE ORDERED that the objections of Hendricks and the limited exceptions of Steinway to the magistrate's report and recommendation are both denied. The magistrate's report and recommendation is adopted in full and Hendricks' motion for a preliminary injunction is denied.

## REPORT AND RECOMMENDATION

This matter came on to be heard on the motion of plaintiff, Hendricks Music Company, Inc. ("Hendricks"), for a preliminary injunction to enjoin the termination of Hendricks' Steinway, Inc. ("Steinway") dealership. Hendricks' complaint alleges that Steinway's conduct in seeking to terminate Hendricks' Steinway dealership because of Hendricks' agreement to handle the "Con-

1. Plaintiff does not appear to be pressing its state law claims at this juncture.

cert and Artist Program" of Yamaha Music Corporation ("Yamaha") constitutes an illegal exclusive dealing agreement, in violation of § 3 of the Clayton Act and § 1 of the Sherman Act; an unlawful tying agreement under § 3 of the Clayton Act; monopolization and attempted monopolization of putative markets for "supplying pianos for concert performances" and for "concert grand pianos" in the United States and various regional and local areas thereof, in violation of § 2 of the Sherman Act; violations of the Illinois Antitrust Act and breach of contract.[1] Hendricks' motion for preliminary injunctive relief seeks an order enjoining the termination of Hendricks' Steinway dealership, originally scheduled by Steinway to take place on January 17, 1988, pending trial on the merits.

This court heard evidence on the motion on January 11, 12, 13, 14, 15 and 21. Having heard the evidence and the arguments of the parties and having reviewed the proposed findings of fact and conclusions of law submitted by the parties, this court recommends that the district court adopt the following proposed findings of fact and conclusions of law:

## RECOMMENDED FINDINGS OF FACT

### The Parties

1. Hendricks Music Company ("Hendricks") is an Illinois corporation, having its principal place of business at 421 Maple Avenue, Downers Grove, Illinois. (Complaint ¶ 4.) Hendricks is a piano retailer, having been in the business of selling new and used pianos and providing the services incident thereto since 1974.[2] Hendricks has sold Yamaha brand pianos continuously since 1974. In 1979, Hendricks became Steinway's exclusive piano dealer in the Chicago area. Today, in its Chicago-area stores, Hendricks sells Steinway, Yamaha and Samick pianos and is the exclusive Steinway dealer for Cook, DuPage, McHen-

2. All references to "pianos" are to acoustic pianos.

ry and Lake counties. (Tr. Jan. 11 at 34–38, 60.)

2. Hendricks began business with only one store, located at 4936 Main Street, Downers Grove, Illinois. Today, Hendricks has four stores. Its flagship store, which has 9,000 square feet displaying between 85 and 115 pianos, is located at 755 North Wells Street, Chicago, and opened in June 1980. A store at 3446 West Peterson, Chicago, opened in 1985, and a store at 534 Green Bay Road, Kenilworth, opened in 1986. Hendricks maintains its original store in Downers Grove as well as a 16,000 square foot service center in Downers Grove, opened in November 1981. Hendricks also had a store in Palatine from 1983–1986. (Tr. Jan. 11 at 36–37, 66.)

3. When it opened in 1974, Hendricks had only one employee, Edward A. Hendricks ("Mr. Hendricks"). Today, it has approximately 32 employees including eight in sales, four in finishing, ten in technical services, and six in administration. (Tr. Jan. 11 at 39.)

4. [Finding # 4, which relates to Hendricks' revenue, is being filed separately, under seal. The finding indicates that for the fiscal year ending September 30, 1987, Hendricks' sales were divided among Steinway pianos (40%), Yamaha pianos (31%), Samick pianos (14%) and Everett pianos and used pianos.] (Tr. Jan. 11 at 51–52, 134.)

5. Hendricks has three piano stores in the Minneapolis, Minnesota area, the first of which opened in September 1987. (Tr. Jan. 11 at 83–84.) In its Minnesota stores, Hendricks sells new Yamaha, Samick and Bosendorfer pianos, as well as used pianos. Hendricks does not sell new Steinway pianos in its Minnesota stores. Hendricks does not anticipate that it will derive profits from these stores until the second or third year of operation. (Tr. Jan. 21 at 989–990.)

6. Steinway Musical Properties, Inc. is a holding company formed in 1985 to purchase four music companies from CBS, the largest of which is Steinway & Sons.

Steinway & Sons is a New York corporation, incorporated in 1853. It has two subsidiaries, one in New York and one in Hamburg, Germany. The New York subsidiary is Steinway, Inc., a Delaware corporation, having its principal place of business at Steinway Place, Long Island City, New York. Steinway, Inc. does business under the name Steinway & Sons. (Steinway, Inc., as well as the pianos manufactured by Steinway, Inc., will be referred to herein as "Steinway." The Hamburg company and the pianos it manufactures will be referred to as "Hamburg Steinway.") (Tr. Jan. 14 at 766–768.)

7. Steinway has been in the business of manufacturing and selling grand and vertical pianos continuously in the United States since 1853. The Steinway name is world famous and is generally associated with the finest pianos made. (Tr. Jan. 11 at 125, 180; tr. Jan. 14 at 767–768.)

8. Steinway has 110 dealers in North America. Steinway grants its dealers exclusive territories. Accordingly, a Steinway dealer has no competitors in its territory for the sale of new Steinway pianos during the pendency of its dealership agreement. Steinway dealers are free to sell competing brands of pianos as well as used pianos. The Steinway dealership is very much in demand. (Tr. Jan. 13 at 475, 483, 511, 513; PX 1.)

*Hendricks' Steinway Dealership*

9. In 1979, Hendricks entered into its first dealership agreement with Steinway. The parties' most recent agreement, dated August 7, 1986 ("the 1986 Agreement"), expanded Hendricks' territory to include Lake County. (Tr. Jan. 11 at 48, 50, 60; tr. Jan. 13 at 492–495.)

10. The 1986 Agreement allows either party to terminate the agreement for any reason upon 60 days written notice to the other party. It states:

This Agreement is subject to cancellation by either party at any time for any reason upon 60 days written notice or such shorter notice as may be reasonable given the circumstances.

(PX 1, art. XI.)

11. The 1986 Agreement also provides:

Dealer will use maximum efforts to foster and develop the sale of Steinway pianos in his territory. He will always represent Steinway in his advertising and sales presentations as the unquestioned leader over other pianos he may handle. Dealer will be aware of, and maintain regular contact with all colleges, universities and music schools in his Territory. He will actively and at all times promote the musical life of the community in which the Steinway piano can play a part. Dealer will avail himself of and utilize the marketing, merchandising and other programs offered to him by Steinway to actively and regularly promote the sale of Steinway pianos, whether such programs are in the areas of product presentation, promotional activities, concert and artist activities, technical activities, institutional sales and advertising or in other areas.

(PX 1, art. VII.)

12. Steinway's dealership agreement does not restrict its dealers from carrying other manufacturers' pianos. It requires only, as indicated above, that the dealer "represent Steinway in his advertising and sales presentations as the unquestioned leader over other pianos he may handle."

13. Through its advertising, promotional and related activities, Steinway has developed a reputation for leadership in the piano industry which is unsurpassed by its competitors. The Steinway name is recognized throughout the United States and the world as representing the preeminent piano. The Steinway trademark is an extremely valuable trademark. (Complaint ¶ 28; Answer ¶ 28; tr. Jan. 14 at 769.)

14. The Steinway name carries a connotation of quality, integrity and prestige which "rubs off" on the dealer. The appointment as a Steinway dealer has traditionally established that the dealer is the preeminent piano dealer in its marketplace. (Tr. Jan. 11 at 59–60; PX 12 at 2; PX 13.)

15. The Steinway name draws customers into Hendricks' stores and facilitates Hendricks' ability to sell other brands of pianos, including Yamaha and Samick pianos. (Tr. Jan. 11 at 132–133.)

*Pianos*

16. Most piano manufacturers, including Steinway and Yamaha, manufacture both vertical pianos and grand pianos. A grand piano displaces its soundboard and its mechanism horizontally, whereas a vertical piano, frequently called an "upright," displaces its soundboard vertically. (Tr. Jan. 11 at 55.)

17. Vertical and grand pianos are manufactured in different sizes. Vertical pianos range from approximately 36 inches in height, to 44 or 45 inches (called studio verticals), to approximately 52 inches (professional size verticals). Pianos styled as grand pianos may be as small as approximately 4 feet 6 inches in length, although pianos shorter than 5 feet may not be considered true grand pianos. There are no uniform industry sizes. (Tr. Jan. 11 at 54–56.)

18. The largest and most expensive pianos manufactured are "concert grand pianos." The term "concert grand" is a recognized term in the piano industry and refers to a piano which is designed and built specifically for concert use. Concert grand pianos are approximately 9 feet in length and are frequently referred as "9-foot" pianos. However, as is the case with other piano models, there is no uniform industry size. Steinway's 9-foot concert grand, its "Model D," is actually 8 feet 11¾ inches in length. The concert grand piano manufactured by Fazioli, an Italian manufacturer, is 10 feet 6 inches in length. The concert grand piano manufactured by the German manufacturer, Bosendorfer, measures 9 feet 6 inches in length. (Tr. Jan. 11 at 57–58; tr. Jan. 14 at 574.)

19. Despite these differences in size, there is no dispute in the industry as to which pianos are concert grands. In contrast to all other pianos, concert grands have longer keys, heavier hammers, longer strings and larger soundboards. These differences provide an artist with a greater

dynamic range, a greater range of coloration and more control and power. A concert pianist performing with a symphony orchestra requires the power, control and dynamic range which only a concert grand piano can provide. (Tr. Jan. 11 at 57–58; tr. Jan. 15 at 876–877.)

*The Piano Industry*

20. 1986 is the most recent year for which reliable piano industry statistics are available. The ranking of all piano manufacturers, domestic and foreign, for sales of new pianos in the United States market, is as follows:

| Manufacturer | Units Sold |
| --- | --- |
| Baldwin | 32,600 |
| Kimball | 29,000 |
| Wurlitzer | 21,300 |
| Yamaha | 20,330 |
| Kawai | 12,800 |
| Young Chang | 10,750 |
| Samick | 10,000 |
| Sojin | 6,000 |
| Schafer & Sons | 5,000 |
| Schumann Maeari | 4,000 |
| Steinway | 2,900 |
| Sohmer | 1,750 |
| Hyundai Tokai | 1,650 |
| Tadashi | 700 |
| All others | 6,420 |
| Total | 165,200 |

Steinway's sales of 2,900 pianos represented 1.75% of the total new acoustic piano market in terms of volume. Yamaha's sales represented a 12% market share by volume. (DX 38.)

21. There were 39,330 grand pianos sold in the United States in 1987. Steinway sold 2,100 for a market share of 5.34%. Yamaha, by Steinway's estimates, sold 8,700 grand pianos in 1987, a 22% share. Yamaha's figures indicate 6,800 sales "last year." While it appears that Yamaha was the industry leader in grand piano sales in

1987, its sales did not greatly exceed those of its closest rival, Kawai. (Tr. Jan. 12 at 89; DX 39.)

22. While no entirely reliable figures exist, it is estimated that approximately 250 concert grand pianos were sold in the United States during 1986. Steinway was the industry leader in such sales. Terry Lewis, the general manager of the Acoustic Piano Division of Yamaha Music Corporation U.S.A., estimated that sales of new concert grand pianos in the United States in 1986 were as follows:

| Manufacturer | Units Sold |
| --- | --- |
| Steinway | 140 |
| Baldwin | 40 |
| Yamaha | 8 |
| Falcone | 10 |
| Samick and Young Chang | 12 |
| Kawai | 10 |
| Bosendorfer | 30–35 |
| Hamburg Steinway | 6–15 |

The court accepts these figures as the best available estimate except with respect to Steinway, as to which more reliable evidence of approximately 120 unit sales was provided by its Vice President of Sales and Marketing, Frank Mazurco. This amounts to approximately 48% of concert grand pianos sold by unit volume if Steinway's estimates are accepted and approximately 56% if Yamaha's estimates are accepted.[3]

23. Steinway's next most significant competitor in the sale of concert grands was Baldwin, selling approximately 40. Yamaha sold 8 in 1986, accounting for approximately 3% of unit sales. Steinway's share of this putative market in dollars in all likelihood substantially exceeds its share in units since the wholesale and retail prices of the Steinway concert grand are approximately 150% of Baldwin's prices, and the evidence indicated that the Korean pianos (such as Samick and Young Chang)

**3.** On the basis of the above figures, the court finds that approximately 236–250 new concert grand pianos were sold in the United States in 1986. This figure excludes used concert grand pianos, as to which no sales estimates were provided. It is clear that some used concert grand pianos compete with new concert grands, but there was no evidence as to how many used concert grand pianos are sold in a condition adequate to allow them to compete with new concert grand pianos. The figure includes Steinway C & A pianos that, after C & A service, are offered for sale.

are relatively inexpensive.[4] (Tr. Jan. 12 at 104–112; tr. Jan. 14 at 580; tr. Jan. 15 at 881.)

*Steinway's Concert and Artist Program*

24. For many years, the cornerstone of Steinway's efforts to promote the sale of its pianos to consumers has been to advertise the fact that its pianos are the instrument of choice of concert artists. By adopting such a marketing strategy, Steinway seeks to convince consumers of the superiority of its pianos. (Tr. Jan. 14 at 584–585, 600–601, 645–646.)

25. Steinway's dealer agreements, including its agreement with Hendricks, require that its dealers participate in Steinway's Concert and Artist program ("C & A program"). The Steinway C & A program is a promotional program by which Steinway consigns performance instruments to its dealers throughout the United States so that the dealers can make such instruments available for concert use and for use by concert artists. Each Steinway dealer agrees to maintain in "concert ready condition" the inventory of pianos consigned to it by Steinway. The dealer is required to pay Steinway an annual fee for each C & A piano consigned to it ($1,025 in 1986) and, among other things, to do the following:

a. Employ a staff of trained concert technicians to maintain the C & A pianos in concert-ready condition;

b. Provide at the dealer's cost insurance on all C & A pianos; and

c. Maintain adequate, environmentally-controlled space in which to store the C & A pianos (which must be stored on their legs), and provide trained crews experienced in moving nine-foot concert grand pianos.

(PX 1; Complaint ¶ 11; Answer ¶ 11; tr. Jan. 11 at 75; tr. Jan. 14 at 640.)

26. In the New York City area, Steinway maintains its own C & A pianos. Elsewhere, C & A pianos are maintained by Steinway's local dealers. There are about 350 pianos in the Steinway C & A piano "bank" with a total retail value of approximately $12,000,000. (Tr. Jan. 14 at 637, 719.)

27. The Steinway dealer agreement provides that when a dealer supplies a C & A piano for concert use, the dealer is permitted to charge the artist or concert sponsor "the cost of transportation, 'in-the-hall' tuning, check-over and a fair share of the up-keep." It further provides, "Concert service bills should be in keeping with actual costs." (PX 1 at 13.)

28. Steinway maintains a roster of "Steinway Artists." (PX 5.) These artists are not paid endorsers of the Steinway piano. Rather, to become a Steinway artist, an individual must be an active performer who personally owns a Steinway and who has agreed to perform on a Steinway piano professionally whenever possible. (DX 34; tr. Jan. 14 at 632–634.) Steinway's roster of Steinway artists currently includes more than 400 internationally acclaimed concert artists and ensembles including such world-renowned pianists as Claudio Arrau, Vladimir Ashkenazy, Daniel Barenboim, Van Cliburn, Vladimir Horowitz, Murray Perahia and Rudolf Serkin. Each Steinway artist agrees to permit Steinway to use his or her name in advertisements and program announcements stating that the artist uses the Steinway piano. In return, Steinway agrees to make a concert-ready piano available through its dealers whenever the artist performs publicly, in exchange for the out-of-pocket expenses of delivery and in-hall tuning. In this way, each Steinway artist is assured

---

**4.** The evidence was somewhat unclear on the issue of the price of Yamaha's concert grands (models CF and CF–III) in 1986. Yamaha's Terry Lewis indicated that Yamaha's prices were roughly equivalent to Steinway's, but Mr. Hendricks indicated that, at least with respect to the current price for model CF–III, Yamaha's price exceeds Steinway's. *See* Finding 46, *infra.*

As indicated below, the court finds Mr. Hendricks' testimony credible and unambiguous on the issue of the current price of the CF–III. Any apparent inconsistency in Mr. Lewis' testimony is in all likelihood due to imprecision in the questions put to him and in his answers on this point.

that a Steinway piano will be available wherever and whenever he or she performs, even if the performance venue does not have its own Steinway piano. Steinway artists are entitled to priority use of Steinway C & A pianos. While Steinway artists make a commitment to use a Steinway piano whenever they perform, they do not necessarily require a Steinway C & A piano since many concert halls and institutions own Steinway pianos. Steinway artists are free to terminate their relationship with Steinway at any time. (DX 34; tr. Jan. 14 at 632–640, 697.)

29. The fact that a performer has chosen to play a Steinway piano is customarily listed in the concert program. (Tr. Jan. 14 at 647.) For example, at a series of concerts with the Chicago Symphony Orchestra in January 1988, Ivan Moravec, a Steinway artist and renowned pianist, performed. On the title page of the program appears the statement: "Ivan Moravec uses a Steinway Piano." (DX 30 at 29.)

30. Steinway regards this type of endorsement as superior to any other form of promotion. Richard Probst, director of Steinway's C & A program, testified:

> When a concert artist goes onto the stage in Chicago or New York or Philadelphia, he's got 45 minutes to two hours to achieve and accomplish his career, his future earning power.

> His ability to get future dates are [sic] dependent upon a successful outcome of each performance. You can't go get up at the end of the concert and say, gee, I didn't do too well tonight. Come and see me in Cleveland next Thursday. I am sure I will be better.

> His career is on the line every time he walks out on the stage. He's in a very high pressured situation. He is going to play many times two or three hundred pages of music from memory.

> People have paid to watch him. The more famous he is, the more their expectations are heightened.

> So he's got to roll the rock to the top of the hill every time he goes out onto the stage.

> He is therefore—and people who go to concerts understand—that he is in a very precarious position. He wants to have what he thinks is the greatest piano available to him so that the piano is not in the way in between his mind and his physical ability to deliver his musical message.

> So when a pianist sits down on the stage and plays a particular brand of instrument, what he is really saying to the world is I am in a very delicate position, very stressful position. I have a very difficult task to accomplish.

> I choose to use the Steinway piano because I think that's the one that's going to allow me to deliver my profession most effectively.

> And people who buy pianos understand that.

(Tr. Jan. 14 at 645–646.)

31. In the program for the Moravec concert described above, there was a full-color ad for the Yamaha piano, as well as an ad for the Baldwin piano, which is billed as "The Official Piano of the Chicago Symphony Orchestra." (DX 30, facing page 51 and at 84.) Mr. Probst testified, and the court finds, that such advertisements do not have the same impact as the endorsement represented by an artist's decision to play a given piano in concert. (Tr. Jan. 14 at 650.)

32. The Steinway dealer agreement provides that C & A pianos "are required by all Steinway artists, music organizations and most pianists who do not endorse other piano makes." Steinway notifies dealers of required uses by Steinway artists, which take precedence over any other use. The dealer agreement further provides that when C & A pianos are not utilized for such priority uses, "it is to the Steinway dealer's advantage to seek out additional local uses so that the piano and the name of the Steinway dealer are before the public as much as possible." Steinway encourages its dealers to promote the use of the C & A pianos consigned to them for other local events, and Steinway considers the

dealer's success in placing C & A pianos a factor in evaluating the dealer's effectiveness. (PX 1 at 12; tr. Jan. 14 at 558.)

*The Role of Dealers and Technicians in Steinway's C & A Program*

33. An integral part of Steinway's C & A program is the participation of its dealers, who must maintain their C & A pianos in such concert-ready condition as will satisfy the most discriminating and demanding performing artists. As stated above, each Steinway artist is assured that no matter where he or she performs, a concert-ready piano will be available for him or her to play. Piano virtuosi perform throughout the country, and Steinway's C & A program positions Steinway pianos throughout the country to meet Steinway artists' performance needs wherever they play. (Tr. Jan. 14 at 604.)

34. Maintaining and preparing pianos for concert performance requires the services of highly skilled and trained concert technicians who must perform, *inter alia*, the following specialized adjustments before a piano is ready for the concert stage:

a. Tuning. This requires adjusting the tension of the piano's strings so that each of the eighty-eight notes is at the proper pitch, as well as ensuring that the tension adjustment is stable.

b. Voicing. Voicing involves the regulation of the quantity and quality of sound that the piano produces. When a key is depressed, the hammer strikes the string; the vibrations of the string are passed to the bridge, where pressure is exerted and vibrations produced which are then passed from the bridge to the soundboard. Voicing involves adjusting the manner in which the hammer contacts the string, and requires subtle adjustments of the hammer's position, manipulation of the level of the strings and physical manipulations of the shape and firmness of the surface of the hammer (by means of filing, pricking or application of chemical agents), all with the objec-

tive of achieving the maximal sound quality for the works to be performed while ensuring that the sound quality and quantity are even across the whole keyboard. In order to satisfy a performing artist, each of the felt hammer heads of the eighty-eight hammers that strike the piano strings must be perfectly shaped and perfectly conditioned to the required degree of hardness, and must strike the strings at precisely the right place in order for the strings to emit a uniform tone.

c. Action Regulation. Action regulation involves the intricate mechanical adjustment of the thousands of parts in the action, including the height of each key; the distance the key can travel downward; the key's tilt, spacing and alignment; the positioning of the hammers and adjustment of the movement of the hammers in response to varying amounts of pressure on the keys.

(Tr. Jan. 13 at 330–351.)

35. Regulation and voicing are part of the regular maintenance of a concert piano. They are for the most part performed ahead of time, before the piano is delivered to the concert hall, although in-hall adjustments may be required.

36. A concert technician may be required to make adjustments in the preparation of the piano based on its intended use and user. Hendricks' technical services director, David Hines, testified that "[t]he best results on a concert piano for a given concert should involve a communication between the artist and the concert technician, because the artist can push the piano to limits that the technician can't. And the artist may discover something that they can point out to the technician, and then once knowing about it, may be able to make some correction." (Tr. Jan. 13 at 354.)

37. There are no tools which can objectively measure the quality or consistency of the sound of a piano. In determining prop-

er voicing and regulation, the technician relies primarily on his ear, on his subjective musical judgment and on his experience. (Tr. Jan. 13 at 349–350.)

38. Hendricks' chief technician, Mr. Hines, came to Hendricks with a background in playing classical piano and in piano tuning. After coming to work for Hendricks, he received one week of training in basic Steinway regulation at the Steinway factory. Additionally, he received training from an individual named Fred Drash, Steinway's former head technician, whom Mr. Hendricks for a time brought in twice a year at Hendricks' expense to work with its technicians. The remainder of Hines' training was on-the-job training, beginning with concert tuning work and then learning skillfully to voice and regulate by actually working on the Steinway C & A pianos consigned to Hendricks. (Tr. Jan. 13 at 324, 356–360.)

*Hendricks' C & A Activity*

39. Steinway currently consigns nine pianos to Hendricks for $1,100 each per year for use in the C & A program. These include six Model D pianos (nine foot concert grand pianos), two Model B pianos (seven foot grand pianos) and one Model M grand piano (a five foot seven inch grand piano). (Tr. Jan. 11 at 74.)

40. With two exceptions, Hendricks maintains the Steinway C & A pianos at its Downers Grove warehouse, delivers them to performance halls when needed, prepares the pianos to be played by the artist and retrieves the pianos following each performance. (Tr. Jan. 11 at 75–78). The exceptions are two pianos consigned to Hendricks by Steinway which Hendricks has essentially permanently leased to (1) Orchestra Hall and (2) WFMT. In cases other than these two, where Hendricks supplies a C & A piano, it bills the concert sponsor for its out-of-pocket expenses on a per use basis, or in some cases, bills Steinway who in turn bills the concert sponsor or artist. The average round trip price of providing a Model D concert grand piano charged by Hendricks is $620. (Tr. Jan. 11 at 75–78, 81; tr. Jan. 12 at 62–63.)

41. With respect to the Steinway C & A piano kept at Orchestra Hall, tuning and some other adjustments are performed by Tom Porter, Orchestra Hall's staff tuner-technician, rather than by Hendricks personnel. David Hines works on the C & A piano at Orchestra Hall approximately twice a year. (Tr. Jan. 13 at 397–399.)

42. Hendricks delivered Steinway C & A pianos for concert performances on 110 occasions in 1987 (this number is exclusive of C & A piano use at Orchestra Hall and WFMT). In 1987, there were 33 occasions on which Steinway artists appeared in the Chicago area, 16 of which were at Orchestra Hall and hence did not require delivery of a piano. Therefore, approximately 93 of Hendricks' 110 C & A deliveries were for uses other than by Steinway artists. (Tr. Jan. 14 at 683, 698.)

43. The 110 performances in 1987 for which Hendricks supplied a Steinway C & A piano represented only a small percentage of the concert piano performances in Chicago, and an unproven fraction of the times a Steinway piano was used by an artist in the Chicago area in 1987. (Tr. Jan. 14 at 702.)

*Yamaha's C & A Program*

44. Yamaha is the world's largest piano manufacturer and seller. (Tr. Jan. 14 at 782; tr. Jan. 11 at 148.) By its own estimate, it sold 6800 grand pianos in the United States last year, making it in all likelihood the industry leader in U.S. grand piano sales. (Tr. Jan. 12 at 89; DX 39.) However, Yamaha's sales of concert grands for 1987 totalled only 10, compared to Steinway's approximately 120. Yamaha attributes its low sales of concert grands not to competitive pressure but to the inadequacies of its 9-foot instrument, the "CF." Terry Lewis testified:

> One of the reasons for that [the low sales], quite frankly speaking, was that our, up to that point, our CF model concert grand was probably not a concert worthy enough instrument to compete on the concert stage with Baldwin and Steinway and Bosendorfer and some of

the other of the handful of the world's great pianos as we would like. Although we had a very strong professional following and base of loyalty, it was largely built around our C7, which is a 7 foot 4 inch instrument, and other conservatory models, not our concert grand.

(Tr. Jan. 12 at 104–105, 119; tr. Jan. 15 at 881.)

45. As Terry Lewis further testified:

Over a long period of time, our engineers worked very hard to come up with what they felt was a world class instrument, one that could really effectively compete, not only on the performance concert stage, but in piano competitions, piano festivals, any venue in which concert grands must perform and meet the rigorous standards and requirements of the world's top pianists and the top pianists-to-be around the globe.

(Tr. Jan. 12 at 119–120.)

46. In 1982, Yamaha introduced its "world class instrument," a new concert grand piano, the CF–III, which it maintains is "an instrument … capable of occupying a share of the concert stage and concert related events anywhere with anybody." In contrast to other Yamaha pianos, the CF–III is not built on a conveyor system or production line but is built by a smaller and specialized production team. The degree of handcraftsmanship is greater and many parts manufactured by automated processes for other Yamaha pianos are made by hand for the CF–III. Each CF–III takes 18 months to build. The retail sales price of the CF–III at Hendricks is $53,000, $10,-000 higher than the price Hendricks charges for the Steinway Model D. Since Hendricks applies a uniform percentage markup to its laid-in wholesale cost, it is clear that Yamaha has chosen to price its CF–III higher than the Steinway piano it views as its chief rival. (Tr. Jan. 11 at 204; tr. Jan. 12 at 45, 91–92, 102, 119–120, 204–205; DX 17.)

47. Since the early 1980's, Yamaha has been experiencing competitive pressure from other Far East manufacturers who have entered the U.S. market with pianos that look like Yamaha pianos but which are sold at a lower price. After suffering what Terry Lewis described as "considerable erosion of market share," Yamaha, in 1985, conducted an involved market study and concluded that, using the CF–III, it should develop a Concert and Artist program "to help the average buyer more clearly set Yamaha apart in their mind, in image-up fashion." (Tr. Jan. 12 at 117–118.)

48. In late 1986, Yamaha completed its plan for its Concert and Artist program. The plan, like Steinway's, required that Yamaha establish a pool of pianos around the country, strategically placed so that the pianos could be made available to concert artists and for concert activities. Like Steinway's, the plan required a network of dealers to maintain, prepare and deliver the pianos where needed and to provide technical support services. Further, the plan involved the placement of Yamaha pianos—particularly the new CF–III—on the concert stage in circumstances likely to enhance the prestige of the piano. (Tr. Jan. 12 at 122–127.)

49. As part of its Concert and Artist activities, Yamaha has expended substantial sums of money in sponsoring musical events and in making its pianos available without charge in "showcase" circumstances. For instance, Yamaha is a sponsor of the prestigious Newport Music Festival, donating money and technical support and offering pianos for placement at the festival's various concert venues. Yamaha has on occasion loaned pianos free of charge to small symphony orchestras. It has supplied its CF–III free of charge to the major international piano competitions held in the United States. It has also made pianos available at no charge to music schools, such as New York's Juilliard School and the University of Minnesota. (Tr. Jan. 11 at 195; tr. Jan. 12 at 13, 129–130, 281.)

50. Yamaha's Concert and Artist program is plainly modeled after Steinway's. The marketing study which led to the development of Yamaha's C & A program

demonstrated to Yamaha that the kind of brand awareness it wished to cultivate was enjoyed by the two manufacturers who had formal Concert and Artist programs, namely, Steinway and Baldwin. (Tr. Jan. 12 at 124–125.) Yamaha has opened a showroom facility for its concert pianos on West 57th Street in New York City, across the street from Steinway Hall, Steinway's main retail facility, and a few doors from Carnegie Hall. (Tr. Jan. 12 at 183–184; DX 22.)

51. Yamaha's Concert and Artist program, like Steinway's, envisions a roster of artists, as described by Terry Lewis, "who will actually use those instruments in order to showcase what it is we would like to portray to the market." (Tr. Jan. 12 at 124.) What Yamaha wishes to portray to the market by attracting concert performers who will play the CF–III was well described by Mr. Lewis:

> Concert performers, particularly classical concert performers, are the opinion leaders of, we believe, the entire piano market and can drive the entire piano market as to its perception of quality and value and legitimacy of a piano line.
>
> \* \* \* \* \* \*
>
> The artists who play the instruments, then, are the tangible representation of the quality and stature of the Yamaha piano, which are very visible and accessible to the general public and a clear demonstration that, indeed, Yamaha is a superior instrument and one of the, again, the handful of the world's great pianos.

(Tr. Jan. 12 at 124–125.)

52. As in Steinway's program, an artist who wishes to become a Yamaha artist agrees to play a Yamaha piano in performance whenever possible. The artist agrees to speak well of Yamaha, to reflect a positive image of the instrument and to allow his or her name to be associated with the promotion of the instrument. In return, Yamaha agrees to provide a concert ready instrument, which is a concert grand in most cases, at the appointed place and time, with adequate technical support and preparation. In contrast to the Steinway Concert and Artist program, Yamaha artists need not personally own a Yamaha piano. Further, whereas Steinway artists or their concert sponsors must pay the costs of delivery and preparation of their instruments, Yamaha is willing in some circumstances to provide a piano without charge. (Tr. Jan. 12 at 124–128, 225–226.)

53. Part of the motivation for the development of the CF–III and Yamaha's Concert and Artist program was to enhance Yamaha's image and to differentiate it from lower priced and lower quality "lookalikes" manufactured in the Far East and viewed by Yamaha as a threat to its position in the marketplace. (Tr. Jan. 12 at 117–118.)

54. Yamaha currently has 15 artists on its Yamaha artists roster. One of these, Andre Watts, was formerly a prominent Steinway artist. In 1987, Watts terminated his relationship with Steinway and joined Yamaha. A number of Yamaha's 15 artists are not classical artists (*i.e.*, Barry Manilow, Lionel Richie, Billy Joel). Yamaha has promised Andre Watts that it will provide a piano to him without charge in all major and medium-sized markets where he performs. Given that Steinway (or its dealer) imposes delivery and preparation charges of approximately $500–$650 for each C & A delivery, Mr. Watts (or his management organization) saves between $80,000 and $90,000 a year by virtue of his arrangement with Yamaha. (Tr. Jan. 12 at 222–224; tr. Jan. 14 at 659.)

55. Yamaha expects that by the end of its fiscal year ending March 1988, it will have manufactured in excess of 100 concert grand CF–IIIs for global distribution. It expects to ship 45 into the United States during the next fiscal year, primarily for C & A use, and expects by March 31, 1989, to have 55 CF–IIIs for C & A use in 42 territories. By this same date, it expects to have a total of 215 pianos of various models in its concert reserve. (Tr. Jan. 12 at 216–219, 231, 314.)

*Hendricks' Involvement With Yamaha's C & A Program and Steinway's Response*

56. In early 1987, Steinway became aware that Yamaha was launching a worldwide Concert and Artist program. Eventually, it learned that Yamaha planned to introduce its program in major and moderate music markets in the United States. (Tr. Jan. 13 at 499–503.)

57. In January 1987, Terry Lewis asked Ed Hendricks, the president of Hendricks, if Hendricks would be willing to represent Yamaha in its new Concert and Artist program in the Chicago market. Inasmuch as Yamaha plans to administer its program itself in New York and Los Angeles, Chicago, for Yamaha as it is for Steinway, is the largest market in which Yamaha's Concert and Artist program calls for representation by an independent dealer. (Tr. Jan. 12 at 156–159.)

58. In February 1987, Steinway requested a meeting with Hendricks to discuss the Yamaha program. Mr. Hendricks indicated that he had been approached by Yamaha and was considering participation in its program. Steinway's representatives responded that Steinway could not tolerate the two C & A programs in one dealership. (Tr. Jan. 11 at 90; tr. Jan. 13 at 505–506.)

59. On November 4, 1987, a meeting was held in New York at which Steinway informed Hendricks that a conflict would exist between Steinway and Hendricks if Hendricks were to represent another manufacturer's concert and artist program. Mr. Hendricks told Steinway that he had not yet signed an agreement with Yamaha. He encouraged Steinway not to overreact, and asserted that Yamaha did not have a concert quality piano. (Tr. Jan. 13 at 529–531.)

60. A few days later, Mr. Hendricks informed Steinway that he had decided to support Yamaha in its Concert and Artist program. He further informed Steinway that Hendricks had received a Yamaha Concert and Artist piano in Chicago. (Tr. Jan. 13 at 531–532.)

61. Mr. Hendricks explained his reasons for deciding to participate in the Yamaha program in this way:

... [T]his is an intensely competitive business, and if there is going to be a Yamaha Concert and Artist Program in Chicago, I wanted the program, to maintain my position in Chicago as the premier supplier of fine, well-prepared concert grand pianos. As a competitor, I didn't want to see it go to any of my buddies.

(Tr. Jan. 11 at 88, 192.)

62. On November 19, 1987, at a meeting held in Chicago, Steinway's president, Bruce Stevens, reiterated Steinway's position, and Hendricks made clear that it was unwilling to change its position. Accordingly, Steinway indicated that it intended to terminate the parties' dealer relationship at the conclusion of sixty days. (Tr. Jan. 13 at 534.)

63. Steinway decided to terminate Hendricks because of Hendricks' agreement to participate in Yamaha's Concert and Artist program.

*Steinway's Other Actions in Response to Yamaha's Announced Concert and Artist Program*

64. Steinway became aware that in mid-September 1987, there would be a meeting of all Yamaha dealers in Phoenix at which Yamaha would announce to its dealers the details of its C & A program. At this time of year, Steinway normally sends to all its dealers its "box-score," an annual survey of the percentage of piano performances with major orchestras at which Steinway pianos are played. (Tr. Jan. 13 at 520–522.) In 1987, Steinway accompanied its box-score mailing with a letter from its Vice President for Sales and Marketing, Frank Mazurco, dated September 8, 1987, which read:

The Steinway Concert and Artist program is a proud heritage we share and it is an integral element in our "working partnership" agreement. Just as we adhere to one standard in the making of each and every Steinway & Sons piano,

our Concert and Artist Program must not tolerate compromise. As you well know this important program has been and will continue to be the backbone of our marketing and selling strategy. Therefore we feel it is essential that you represent only Steinway & Sons in all concert and artist activities.

The Steinway "Working Partnership" is a concept based on integrity and the Concert and Artist program, a most valuable asset, is a very significant way for you to create market differentiation. I can assure you our standards of product and program qualities will not be compromised in any way. Therefore we expect your understanding and *exclusive* support of the Steinway & Sons Concert and Artist program.

(PX 2, emphasis in original.)

65. This letter was mailed Federal Express to all joint Steinway–Yamaha dealers shortly before the Yamaha dealers' meeting in Phoenix, but mailed regular mail to all other Steinway dealers. Steinway's intent was to ensure that all joint Steinway–Yamaha dealers realized before they left for the Yamaha dealers' meeting that Steinway would disapprove of any Steinway dealer's decision to participate in the Yamaha C & A program. (Tr. Jan. 13 at 520–522, 612.)

66. The Mazurco September 8 letter makes clear that Steinway views a Steinway dealer's agreement to represent Yamaha's C & A program as a breach of the dealer's agreement with Steinway. In conversations with Hendricks, Steinway's executives asserted that they would not tolerate the two C & A programs in one dealership. The court finds that it is Steinway's policy to require its dealers to represent Steinway's C & A program exclusively. (Tr. Jan. 11 at 90; tr. Jan. 13 at 528; PX 2.)

*The Effect of Steinway's Exclusivity Policy on Competition*

67. Yamaha's plan for its Concert and Artist program envisions a number of "phases." Phase 1 consists of 22 geographical markets [5] to which concert instruments would be shipped by March 1988. Phase 1 markets are those markets which represent the highest frequency of concert activity, with Phase 2 and Phase 3 including progressively smaller centers for concert activity. There are about 20 markets in Phase 2. Phase 3 markets have not yet been identified, although Yamaha expects Phase 3 to include approximately 20 markets. (Tr. Jan. 12 at 138–142.)

68. In twenty of its twenty-two Phase 1 markets, Yamaha is represented by independent dealers and in two, New York and Los Angeles, it represents itself. Of the twenty dealers it has selected to represent it in these twenty markets, eleven are also Steinway dealers. Of the eleven, seven are the *exclusive dealer* for both Yamaha and Steinway in their respective marketplaces ("joint-exclusive") and four occupy territories in which they are the only Steinway dealer but not the only Yamaha dealer ("joint-nonexclusive"). Of the seven joint-exclusive dealers, two (Atlanta and Cleveland) have agreed to participate in Yamaha's C & A program and five (Denver, Phoenix, New Orleans, St. Louis and Kansas City) have declined. Of the four joint-nonexclusive dealers, two (Detroit and Philadelphia) have declined to represent Yamaha's C & A program and two (including Hendricks) have agreed to participate. Hence, nine of twenty Phase 1 independent dealers are not affected by Steinway's exclusivity policy and four of the eleven who are affected have decided to represent Yamaha anyway, giving Yamaha, to date, commitments in thirteen out of twenty Phase I markets. (Tr. Jan. 12, 157–163, 174, 189.)

69. In the United States as a whole, 40 of Steinway's 110 dealers also sell Yamaha pianos. (Tr. Jan. 13 at 513.)

70. There are 365 Yamaha piano dealers in the United States operating 500 storefronts. (Tr. Jan. 12 at 82.)

---

5. The use of the term "market" in this context means territories and is not intended to suggest anything with respect to product and geographic markets in the antitrust sense.

71. In selecting dealers to represent its C & A program, Yamaha has looked for dealers who are associated with technicians who have high quality abilities as preparers of concert instruments. A dealer who services Concert and Artist instruments must have access to tuner-technicians who have the ability to tune, regulate and voice a piano to meet the demanding requirements of a concert virtuoso. Such technical skills can be developed only with experience. Historically, most classically trained concert technicians have obtained much of their experience working on Steinway pianos. (Tr. Jan. 13 at 152–154, 356.)

72. Another criterion used by Yamaha in identifying dealers to represent its C & A program is that it has sought dealers with Concert and Artist experience, who are familiar with local concert halls, with the local classical music scene and with people who are experienced in the delivery of concert grand pianos. Yamaha has also sought dealerships that have the financial capacity, energy and resources to propel Yamaha's Concert and Artist instruments into local prominence and to "cultivate cultural centers of influence" in their markets. (Tr. Jan. 13 at 154–155.) Given the success of Steinway's Concert and Artist program in comparison to those of its only two significant rivals, Baldwin and Bosendorfer, it is clear that dealers who meet this criterion will in many cases be Steinway dealers.

73. C & A dealerships also need the physical plant and facilities to store the instruments properly, on their legs, in a climatically controlled environment and concert ready at all times. (Tr. Jan. 13 at 156.)

74. No evidence was introduced which would permit the court to determine on a nationwide basis the number of Yamaha's targeted concert and artist "markets" in which, if the Steinway dealer declines to represent Yamaha's program, there will either be no other Yamaha dealer available or no other dealer available who has the capacity to represent Yamaha's program adequately.

75. Yamaha has six dealers besides Hendricks in the Chicago area. They are located in downtown Chicago (Beautiful Sound), Aurora, Elgin, Addison, in the south suburbs and in the northern suburbs. Yamaha concluded that of its Chicago-area dealers, only Hendricks met its criteria for Concert and Artist representation. (Tr. Jan. 12 at 158–159.)

76. Hendricks' chief tuner-technician, David Hines, appears from all the evidence introduced to be the most experienced and skillful tuner-technician in the Chicago area who is not associated with a specific concert venue or hall. The evidence was insufficient to establish, however, that other tuner-technicians in the Chicago area, such as Brian Mott, who works on an independent contractor basis for the Beautiful Sound, Yamaha's other downtown Chicago dealer, and whose experience is largely in the area of popular music and jazz, could not adequately service Yamaha's Concert and Artist instruments. The court therefore must conclude that in the Chicago area, adequate Concert and Artist support services would be available to Yamaha even if Hendricks were to refuse to represent its program.

77. Concert and Artist service can be provided from afar. A few days before the hearing on Hendricks' motion, Yamaha provided concert service from New York for two Yamaha artists performing in Zanesville, Ohio. The artists were charged transportation costs. (Tr. Jan. 12 at 228.)

*Impact of Termination of its Steinway Dealership on Hendricks*

78. The impact on Hendricks if Steinway is permitted to terminate its dealership will be substantial, having at least the following effects:

a. loss of Steinway sales (over 40% of Hendricks' yearly dollar volume) plus an unquantifiable loss of sales of Yamaha and Samick pianos because of loss of the drawing power of the Steinway name;

b. disruption of a steady growth pattern in Hendricks' business from

$200,000 in sales in Hendricks' first year of operation to the sales Hendricks enjoys today (see Finding # 4, filed under seal);

c. likely inability to maintain its large employee staff, many of whom have been highly trained at Hendricks' expense, due to the substantial decrease in sales; and

d. likely inability to maintain its four retail locations.

(Tr. Jan. 11 at 122–123.)

79. Hendricks has already experienced repercussions from the threatened termination:

a. a previously-approved $400,000 line of credit has been withheld; and

b. other Chicago piano dealers are telling customers that Hendricks has been terminated because it is unable to handle the Steinway line, seriously injuring Hendricks' reputation.

(Tr. Jan. 11 at 123–124.)

80. It has taken fourteen years and substantial time and money to build Hendricks into the company it is today. Hendricks' business and reputation has to a large extent been built around the Steinway piano. If the termination is effected but Hendricks ultimately prevails, it will in all likelihood be unable in any reasonable period of time to rehire its lost employees, or train new ones, recapture its lost reputation and goodwill and rebuild its business as it exists today. (Tr. Jan. 11 at 124–125.) There is no basis, however, for finding that Hendricks' Chicago business will fail as a result of the loss of its Steinway dealership. The evidence is clearly to the contrary.

81. In late 1987, Hendricks opened three stores in the Minneapolis, Minnesota area where it will sell Yamaha, Samick, Bosendorfer and Kimball pianos, but not Steinway pianos, and will participate in the Bosendorfer and Yamaha Concert and Artist programs. Mr. Hendricks testified that he will be successful in Minnesota without Steinway, although he does not expect to make a profit until sometime between the second and third year. (Tr. Jan. 11 at 83–85, 163.)

82. Yamaha encouraged Hendricks to open its Minnesota stores and is assisting it financially, providing $30,000 per store to cover costs incurred in the opening of the stores. Normally, Yamaha requires no payment on pianos delivered for sale for ninety days and thereafter puts the pianos on Hendricks' floor plan, requiring payment of 16.75% interest on the balance, which is typically in the area of $325,000 to $350,000. Yamaha has offered Hendricks special terms in Minnesota, with no payment required on unsold pianos for 6 months and substantial discounts for pianos sold quickly. [In contrast, Steinway offers its dealers cash terms only with a 2% discount for payments made within 15 days.] (Tr. Jan. 11 at 154, 156–160.)

*Harm to Steinway if it is not Permitted to Terminate Hendricks*

83. The court finds that Steinway will suffer harm if it is not permitted to terminate Hendricks during the pendency of this litigation. Chicago is the most significant music market in the United States where Steinway depends on an independent dealer. Steinway's dealerships are exclusive, so that it is essentially helpless to counteract any lack of ardor on its dealers' part in promoting its product, other than by invoking the dealership agreement's termination clause. Hendricks and Steinway are now in an adversary posture in this litigation, while Hendricks and Yamaha, Steinway's chief competitor for Hendricks' sales, are closely allied in a number of ways. Yamaha is providing Hendricks with substantial economic support in connection with the opening of Hendricks' three Minnesota stores (cash assistance and favorable credit terms). In addition, Yamaha is providing some financial support to Hendricks to maintain this litigation against Steinway. Steinway can be reasonably concerned that as Yamaha pursues its effort to invade Steinway's dominance of the concert stage, Hendricks will promote Yamaha with more vigor than Steinway, given that if Hen-

dricks does not prevail in this litigation, its future fortunes will lie entirely with Yamaha. The harm to Steinway's goodwill and reputation, as well as the economic harm it will suffer, stemming from Hendricks' dispute with Steinway and alliance with Yamaha, may be significant and will not be quantifiable.

84. The court agrees with Steinway that there is an inherent conflict when one dealer seeks to represent both Steinway's and Yamaha's Concert and Artist programs. Because most significant classical pianists are Steinway artists, Yamaha cannot hope to succeed with its program (at least not in the foreseeable future) unless Steinway artists can be induced to terminate their relationships with Steinway to become Yamaha artists. This has happened on at least one occasion to date and the impact has been dramatic. Sometime during 1987, Andre Watts, a renowned Steinway artist, severed his connection with Steinway and became a Yamaha artist. During the course of the preliminary injunction hearing in this matter, Mr. Watts played his twenty-fifth anniversary concert in New York. Television and newspaper coverage of that concert paid substantial attention to the fact that Mr. Watts was playing a Yamaha piano. It is clear that any Yamaha dealer who seeks to promote Yamaha pianos by reference to Mr. Watts' choice is undermining Steinway's claim that Steinway is the instrument of choice of major classical artists.

85. Steinway's position that one dealer cannot, without a conflict of interests, represent both Steinway's and Yamaha's Concert and Artist programs is further supported by aspects of these programs separate from the artist roster component. A dealer's obligation under the Steinway program clearly includes his obligation to promote the Steinway and "work" the territory, to try to persuade local concert sponsors and institutions to permit Concert and Artist pianos to be placed in situations where public awareness of the brand and prestige of the trademark will be enhanced.

(Tr. Jan. 13 at 686–687.) This is a key aspect of Yamaha's program as well. (Tr. Jan. 11 at 195; tr. Jan. 12 at 129–130, 155.)

86. In representing both manufacturers, the dealer is in a conflict position each time an opportunity to showcase a Concert and Artist piano arises because he can influence the consumer's choice either by choosing to promote one brand to the exclusion of the other or by the vigor and/or approach he employs in offering the consumer the competing choices. While Mr. Hendricks contends that there is no real conflict because the Yamaha CF–III is not qualitatively competitive with the Steinway concert grand, Steinway's concern is legitimate. The fact that Yamaha has attracted a renowned concert pianist (Andre Watts), who has terminated his long-term affiliation with Steinway and agreed to perform exclusively on the CF–III, is substantial evidence (and would be so perceived by piano consumers) that Yamaha has produced a respectable concert instrument. Moreover, the concert situations in which dealers typically will attempt to place Concert and Artist pianos will rarely demand as much of the instrument as a major concert performance by a major classical pianist at a major symphony hall, so that even if Mr. Hendricks is correct as to the ultimate superiority of the Steinway, that would not require him to recommend the Steinway for every occasion which offers an opportunity to place a Concert and Artist piano. Finally, the fact that in many circumstances dealers are not permitted to charge concert sponsors for Yamaha Concert and Artist pianos, but instead have their costs reimbursed by Yamaha, gives the dealer a clear competitive advantage over other potential piano suppliers if he promotes Yamaha. Hence, the court finds that Yamaha's decision to hold itself out as Steinway's rival for preeminence on the concert stage has created a substantial conflict of interests for any dealer who seeks to represent both manufacturers' Concert and Artist programs.

87. An undertaking to promote a manufacturer as a maker of concert instruments

requires a distinct promotional emphasis as well as a substantial floor space commitment. These factors also give rise to a conflict in attempting to represent two Concert and Artist programs in one dealership. (Tr. Jan. 14 at 587.)

*Additional Factfindings Relating to the Claim that there is a Relevant Market for Concert Grand Pianos*

88. The purchasers of concert grand pianos are primarily concert halls, concert artists and institutions, which require the specific qualities that only a concert grand piano can provide. (Tr. Jan. 11 at 58–59.) The evidence indicated that individuals make up an extremely small percentage of the buyers of such instruments. Given the size, cost and dynamic range of a concert grand piano, the court finds it improbable that a significant number of such pianos are purchased by individuals for residential use. (Tr. Jan 11 at 58–59; PX 22.)

89. Concert grand pianos have unique functions and uses. They are the only pianos suitable for performances with orchestras and for other virtuoso performances. Most buyers of concert grand pianos buy them because their need cannot be satisfied by a smaller piano. On the virtuoso concert stage, concert grand pianos face no competition from other piano models. Given the importance to a virtuoso performer of having an adequately powerful and adequately responsive instrument, as testified to most eloquently by Steinway's Mr. Probst, the court finds that there is virtually no elasticity in the demand for concert grand pianos. In most circumstances where a concert grand is appropriate, no substitute is adequate.

90. The fact that Yamaha seeks to compete with Steinway with a piano costing approximately $10,000 more than Steinway's and that Steinway's executives view this pricing decision as a competitive threat is persuasive evidence that this market is not sensitive to price increases and further evidence of low elasticity of demand.

91. Used concert grands may be suitable for the uses for which new concert grands are purchased. There was nothing in the record to indicate that used concert grands are a significant factor in this putative market.

*Additional Factfindings Relating to the Claim that there is a Relevant Market for Concert and Artist Pianos and Services*

92. Plaintiff maintains that there is a relevant product market in this case which it describes as "the market for furnishing pianos to performing artist for use in concerts, recitals and similar events." (Plaintiff's Proposed Findings of Fact and Conclusions of Law at 9.) Plaintiff contends that the only participants in this market are Steinway, Baldwin and Bosendorfer, with Yamaha as a new entrant; that Baldwin's and Bosendorfer's programs are small and insignificant (which the court finds to be the case); that Yamaha's program is just beginning and that Steinway, by necessary implication, dominates the market. (*Id.*)

93. Both Steinway and Yamaha view their concert and artist programs as a promotional tool, rather than as a product. (*See* testimony of Richard Probst, Jan. 14 at 644–645; testimony of Terry Lewis, Jan. 12 at 186.) Steinway seeks to recover its costs and its dealers' costs of providing pianos for concert use. Yamaha plans to absorb some of the costs of the program itself.

94. Since a very large (albeit unproven) percentage of major performing classical pianists are Steinway artists, and Steinway artists almost always perform on Steinway pianos, there is a factual basis for finding that Steinway dominates the classical performance stage. However, the only evidence concerning the percentage of such classical performances that are played on Steinway C & A pianos as opposed to Steinway pianos owned by the performance hall was provided by Steinway's Richard Probst, who estimated at one point in his testimony that performing artists who perform on Steinway pianos use Steinway C & A pianos only 20 to 25% of the time and stated elsewhere that "in more than the

majority of the cases, the venue or the presenter or the city will own a Steinway or two or more" and no C & A piano is required. (Tr. Jan. 14 at 637, 697.)

95. There was no evidence suggesting that artists of modest stature, or most jazz or popular artists, play Steinway C & A pianos with any frequency at all.

96. The evidence supports a finding that Steinway C & A pianos are used in close to 100% of the performances of Steinway artists (a large majority of significant piano virtuosi) performing at concert venues which do not supply their own Steinway pianos.

97. While providing Concert and Artist program pianos does not yield a profit for Steinway, the cost of obtaining a Concert and Artist piano incurred by the artist or concert sponsor is substantial. Evidence indicated that, as an example, Steinway provided approximately 2000 C & A services in New York City last year, at a per occasion cost of $534.50, representing in excess of $1 million dollars in C & A fees charged by Steinway in one year in New York City alone. (Tr. Jan. 14 at 659, 679.)

98. For an artist who performs frequently, C & A fees are substantial. Andre Watts, who recently terminated his affiliation with Steinway and became a Yamaha artist, paid out (personally or through his management organization), on an annual basis, between $80,000 and $90,000 in C & A fees to Steinway. (Tr. Jan. 14 at 659.)

99. The capacity to supply pianos for Concert and Artist use requires adequate facilities for storing and maintaining the pianos and adequate technical support to tune, regulate and voice them.

100. If Yamaha does not have the ability to supply artists with performance pianos as they travel throughout the country, artists will in many cases be unable to play the Yamaha CF–III in concert performances. If Yamaha's CF–III is unavailable, artists who are currently Steinway artists but who hypothetically might wish to play Yamaha's instrument instead will not only be unable to play the Yamaha piano in concert but will be unable to endorse it, at least not without jeopardizing their relationship with Steinway.

## RECOMMENDED CONCLUSIONS OF LAW

In determining whether plaintiff is entitled to a preliminary injunction, the court must consider and weigh the following factors:

1. Whether plaintiff has a reasonable likelihood of success on the merits;

2. Whether plaintiff has an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

3. Whether the threatened injury to plaintiff if the injunction does not issue outweighs any harm that may accrue to the defendant from the requested injunction; and

4. Whether the granting of the preliminary injunction will serve or disserve the public interest.

*See Roland v. Air Line Employees Ass'n, Int'l,* 753 F.2d 1385, 1392 (7th Cir.1985). These factors will be examined in light of the evidence presented at the preliminary injunction hearing.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. *Clayton Act, § 3*

The parties agree that an appropriate starting point for analyzing the legal issues in this case is the court of appeals' decision in *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), a case arising under § 3 of the Clayton Act, 15 U.S.C. § 14. That section makes it unlawful to sell goods on the "condition, agreement, or understanding" that the purchaser "shall not use or deal in" the goods of a competitor of the seller, where the effect of such condition, agreement or understanding "may be to substantially lessen competition or tend to create a mo-

nopoly in any line of commerce." The elements of such a violation are (1) the existence of an agreement, albeit not necessarily an explicit one, between the manufacturer and the dealer that the dealer not handle competing goods and (2) a showing that the agreement is likely to have a substantial anticompetitive effect in the relevant market. 749 F.2d at 392.[6]

Roland, a construction equipment dealer, was for many years International Harvester's exclusive central Illinois dealer. When, in 1982, International Harvester sold its construction equipment business to Dresser, Dresser entered into a dealership agreement with Roland. The agreement, which did not prohibit Roland from selling competing equipment, was terminable at will by either party on 90 days' notice. Shortly after entering into its agreement with Dresser, Roland entered into a similar agreement with Komatsu, a Japanese construction equipment manufacturer. Sometime thereafter, Dresser gave notice of its intention to terminate Roland. Roland sued to enjoin the termination and moved for preliminary injunctive relief.

In considering the issue of likelihood of success on the merits, the district court determined that the relevant geographic market was central Illinois, and that of this market, Dresser had a 17% share and Komatsu 1%, with all the sales of both brands made by Roland. The district court also found that an implied exclusive dealing arrangement existed between Roland and Dresser, satisfying the first of the two prongs of a § 3 cause of action, and that Komatsu, which had no exclusive dealerships in the midwest, could not enter the market unless it persuaded a dealer for another manufacturer to carry Komatsu equipment as a second line. The district court thus concluded that the Dresser–Roland implicit agreement, if enforced, would substantially lessen competition by keeping Komatsu out of the market. Hence, Roland had adequately shown a likelihood of success on the merits.

The court of appeals reversed the grant of a preliminary injunction, finding, among other things, that Roland had not shown a likelihood of success on the merits. The court first found that no contract or agreement had been shown. It noted that the parties' dealership agreement contained no exclusive dealing provision and that Roland was unaware of any implicit restriction, since it contracted with Komatsu shortly after entering into its agreement with Dresser. The court of appeals further noted the absence of evidence that any Dresser dealer declined to handle a competing line as a result of surveillance, intimidation or coercion, which, it suggested, could, in appropriate circumstances, demonstrate the existence of a tacit understanding. The court made clear that "an agreement requires a meeting of the minds, and there is no evidence Roland ever thought itself bound to carry only the Dresser line." *Id.* at 392. The court also concluded that evidence of Dresser's hostility to dealers who undertook to represent competing lines and its willingness to terminate them showed not an agreement but its opposite—a failure to agree on a point critical to one of the parties. *Id.* at 392–393.

With respect to the issue of whether the agreement, assuming one existed, was anticompetitive, the appeals court also found that Roland had failed to demonstrate a fair chance of winning at trial. Exclusive dealing agreements, the court observed, must be judged under the rule of reason, and will be condemned only if found to restrain trade unreasonably. *Id.* at 393. The court held that a plaintiff must establish two things to show that an exclusive dealing agreement is unlawful:

> First, he must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclu-

---

6. The "line of commerce" language in § 3 requires delineation of the relevant product and geographic markets. *Euramca Ecosystems, Inc.*

*v. Roediger Pittsburgh, Inc.*, 581 F.Supp. 415, 421 (N.D.Ill.1984).

sion of a significant competitor, the agreement cannot possibly harm competition. Second, he must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition; he must show in other words that the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it.

*Id.* at 394.

The court noted that Komatsu, while at that time a small presence in the central Illinois area, was the second largest construction equipment manufacturer in the world, with total sales four times those of Dresser's, and that it had become in a short time a major factor in the U.S. market, despite the nationwide practice of exclusive dealing in the construction equipment business. The court further noted that all Komatsu would have to do to get its own exclusive central Illinois dealer would be to offer another manufacturer's dealer better dealership incentives. In short, the court concluded, while Dresser's conduct might have the effect of causing Komatsu's expansion to proceed more slowly and somewhat more expensively than would be the case if it could persuade dealers to carry its equipment as a second line, Dresser's conduct was unlikely to keep Komatsu out of the relevant market, in view of Komatsu's strength and the fact that it had the resources to establish its own central Illinois dealership. Hence, a substantial anticompetitive effect had not been shown.

## 1. Existence of a condition, agreement or understanding

In contrast to the facts at issue in *Roland,* this court concludes that plaintiff has demonstrated the probable existence of an agreement as required by § 3. Steinway has made clear that Steinway dealers who agree to represent Yamaha's Concert and Artist program risk termination. It made this clear in a letter sent by Federal Express to all joint Steinway–Yamaha dealers on the eve of a Yamaha dealers' meeting at

which plans for the Yamaha program were to be announced. (PX 2.) Steinway's letter told its dealers that "it is essential that you represent only Steinway & Sons in all concert and artist activities" and stated that Steinway expected its dealers' *"exclusive* support." (*Id.,* emphasis in original.) Steinway's manifest intent was to warn its dealers that if they agreed to represent Yamaha's C & A program, they would be considered in breach of their Steinway dealership agreement. There was also evidence that Steinway's actions had an impact: while Hendricks chose to cast its lot with Yamaha, seven joint dealers in the initial 22 markets Yamaha seeks to enter have declined to represent its program. Since in contrast to the Steinway program, which is costly to dealers, Yamaha does not intend to charge dealers for the C & A pianos consigned to them, it is reasonable to assume that Steinway's insistence that its dealers represent its C & A program exclusively influenced these dealers' decision to decline to represent Yamaha. This is far different from in *Roland,* where there was no evidence that Dresser's preference for exclusive dealing had caused any Dresser dealer to decline to deal with Komatsu.

Moreover, it is Steinway's position, which this court finds at least colorable, that it is a breach of Steinway's dealership agreement for a Steinway dealer to represent a competing Concert and Artist program. What Steinway means when it says it is to be represented as "the unquestioned leader," and what its dealers understand Steinway means, is that Steinway is to be represented as the choice of the world's great pianists, not only in what the dealer says to customers but in the way the pianos are promoted and displayed. A dealer who holds himself out to the public as a representative of a Yamaha program, the message of which is that the world's great pianists play Yamaha pianos, cannot credibly represent Steinway as the Steinway dealership agreement requires. It is a fair conclusion from the evidence at the preliminary injunction hearing that the minds of

Steinway and its dealers have met on this issue (even if no one foresaw at the time of contracting that there would come a challenge to Steinway's ascendancy), and that Steinway's threatened termination of Hendricks is essentially in anticipation of a breach of this provision.

2. Will the effect of the agreement be substantially to lessen competition or to tend to create a monopoly?

This prong of the § 3 test requires an examination of the relevant market and an assessment of the competitive impact of the alleged restraints. The issue is whether Steinway's conduct significantly limits the opportunities for competitors to enter into or remain in the relevant market. *See Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1233 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

#### a. *The relevant market*

The starting point for any inquiry into the effect of an agreement on a line of commerce is delineation of the relevant market, the area within which the impact of the defendant's conduct on competition is to be assessed. The parties agree that the relevant geographic market is the United States. Within this geographic market, plaintiff argues that Steinway's conduct has an anticompetitive impact on two product markets: "the manufacture and sale of concert grand pianos" and "providing C & A pianos and services." Defendant contends that the relevant market is the manufacture and sale of all acoustic pianos, in which Steinway controls a 1.75% market share.

The goal in defining a relevant market is to delineate the area of effective competition between products. *Sargent–Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir.1978), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1979). The court must keep in mind that substitutes exist for every product, yet such substitutes may not be in effective competi-

tion, and the market may not be defined so broadly that all possible substitutes are included. On the other hand, products that are not wholly fungible may be real competitors, and the market must be defined broadly enough so that they are included. *United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed. 2d 953 (1964).

While "the reality of the marketplace must serve as the lodestar," *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987), the courts have identified a number of factors which are relevant to the issue of market definition. In *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962), the Supreme Court described some of them:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors....

(Citations and footnote omitted.) In *Sargent–Welch, supra,* the Seventh Circuit noted that "[t]he most important of these factors is uniqueness of the product's functions and therefore its uses. If two products are 'reasonably interchangeable by consumers for the same purposes,' they are considered to be in the same market." 567 F.2d at 710.

#### (1) Concert grand pianos

The court concludes that plaintiff has shown some likelihood of succeeding on its

claim that the manufacture and sale of concert grand pianos constitutes a distinct product submarket for antitrust purposes. Approximately 250 concert grand pianos were sold in the United States in 1986. The evidence established that while a small number of individuals may purchase such pianos for residential use, the primary buyers of such instruments are concert halls, institutions and concert artists, buyers whose needs require specific qualities that can be provided only by concert grand pianos. Concert grand pianos cost more than other pianos; a piano manufacturer, such as Yamaha, can price its concert grand significantly higher than any other model it manufactures without concern that potential buyers will decide to buy a studio upright instead. Further, concert grand pianos have physical characteristics unique to them: longer keys, heavier hammers, longer strings and larger soundboards. These distinct physical characteristics are essential to the functions for which these pianos are used. Some manufacturers (not including Steinway, however) have unique production facilities for the manufacture of concert grands.

While there are no specialized vendors for concert grand pianos, and while some concert grand buyers' needs might be adequately satisfied by smaller grand pianos, the factor which the Seventh Circuit identified as the most critical has surely been established here. There are functions and uses for which a concert grand is designed and for which no other type of piano can substitute. A concert grand piano is designed to provide—and only a concert grand piano can provide—the power, volume and control essential for virtuoso piano performances and for all performances of a pianist with a symphony orchestra.

Concert grand pianos are manufactured because such uses demand them, and for such uses, there are no substitutes.

Moreover, while the evidence on this point was not explicit, this court was satisfied that for a significant number of buyers of concert grands, there is *no* elasticity of demand. Prices can be raised significantly (consider that the retail price of Yamaha's CF–III is $10,000 higher than that of its competition) without causing consumers to seek substitutes.

While sensitive to the fact that this "market" is minute and that it arguably exists only to give its manufacturers an image that will promote their sales in the broader piano market (that this was a factor motivating the development of the CF–III is clear), the court concludes that plaintiff has adequately demonstrated the likelihood that at trial, it will be able to establish the existence of this product market.[7]

The evidence established that Steinway's share of this market is approximately 48% in unit volume (based on 1986 figures) and somewhat more than that in dollars. Plaintiff contends that Steinway controls 70% of the market in dollar volume, but it has not demonstrated how, from the evidence before the court, that figure was calculated. Regardless, since Steinway has been shown to control roughly 50% of the market, its market share is sufficient to permit an inference of market power, defined as the power to increase prices significantly without losing all one's business. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).[8]

(2) Concert and artist pianos and services

With respect to plaintiff's putative market for C & A pianos and services, the case

**7.** For reasons discussed below, see section IA(2)(b)(1), *infra,* the court is persuaded only that the concert grand piano market is a distinct submarket of the acoustic piano market, not that it is a "relevant market" for purposes of evaluating the impact of Steinway's dealer restrictions on competition.

**8.** Yamaha has chosen to price its concert grand substantially higher than Steinway's, resulting in a $10,000 price difference in the retail market. Obviously, whatever Steinway's share of the market, Yamaha's marketing personnel do not feel any pressure from Steinway to match its prices. Terry Lewis expressly so testified. (Tr. Jan. 12 at 201–202.)

is more difficult. Neither Steinway nor Yamaha views Concert and Artist services (including in the term "services" as used here the supplying of pianos and related services) as a product. Both view it as a promotional tool, a means to create a public perception that their pianos are the choice of artists and hence to convince the public of the prestige and quality of the brand, with the ultimate objective of promoting piano sales in the market for acoustic pianos generally. Steinway recovers only the costs of its program. Yamaha plans to determine on a case-by-case basis whether to recover its costs or to bear them itself, as an inducement to artists to consider its program in preference to its competitors' programs.

Steinway argues that the fact that both manufacturers view this activity as a promotional tool and not as a product or service exempts it from antitrust scrutiny. The only economic activity that takes place, Steinway argues, is that it consigns C & A pianos to its dealers for a fee; no one contends, it argues, that this case has anything to do with any "piano consignment" market. Hendricks points out that viewed from the consumer end, commerce is surely taking place. Artists need performance pianos, and they pay to have pianos provided. There is a buyer or lessor (although nothing is bought and no rental is charged), a commodity and a supplier.

The court pretermits this thorny question because it does not believe that plaintiff has defined a market in any reasonable sense. It is conceded by all that if one looks at the piano supply and rental business as a whole, Steinway occupies an insignificant place in it. There was no evidence to indicate what the size of the market for "pianos supplied by an outside supplier for concert use" is. Steinway's C & A pianos, when not played by Steinway artists, presumably compete with countless

other sources of loaned and rented pianos. There was no suggestion in the evidence that Steinway C & A pianos are usually or even frequently the instrument of choice when all events needing a piano supplied are considered.

Hendricks has four Steinway model D pianos for C & A uses independent of uses at Orchestra Hall and uses by radio station WFMT. Hendricks made 93 C & A piano deliveries in 1987 that were not for concert performances by Steinway artists or for use at Orchestra Hall or WFMT. The "market" in which Steinway's C & A pianos compete is therefore obviously much broader than performances by Steinway artists or performances at Orchestra Hall. Indeed, Yamaha's fledgling C & A program serves 15 Yamaha artists, some of whom, such as Barry Manilow, Lionel Richie and Billy Joel, do not even perform classical music. If such artists are considered "consumers" in this alleged market, it is clear that the market cannot be defined in any way that makes Steinway a significant factor in it.

Steinway clearly has the overwhelming majority of renowned concert pianists on its C & A roster, and these artists, when they perform, perform virtually exclusively on Steinway pianos. But even if one attempts to focus on this consumer market, there is still an inadequate evidentiary basis for delineation of the C & A market plaintiff describes. That Steinway has the commitment of most virtuoso classical pianists in the United States to play exclusively on a Steinway means that when such artists perform, they, or their concert sponsors, must arrange for a Steinway piano to be provided for them.[9] While in occasional cases the artist may transport his own Steinway or obtain one from an independent supplier,[10] it appears that such cases are exceptional, and that normally, the artist either uses a Steinway owned by the

---

**9.** This commitment is terminable at will. It is not disputed that Steinway has in the past achieved these endorsements by virtue of the superiority of its product, without coercion of any kind.

**10.** Evidence about Pro Piano, a New York based piano supplier, indicated that Pro Piano supplies primarily Hamburg Steinways.

performance hall or arranges for delivery of a Steinway C & A piano. The only evidence of record as to the percentage of such artists' performances that are played on C & A pianos, as opposed to pianos owned by the performance venue, was Mr. Probst's testimony that Steinway artists use C & A pianos only 20–25% (or certainly less than half) of the time. While it is unquestionable that Steinway dominates the classical concert stage (in the 1985–1986 season, Steinway was the piano of choice of soloists playing with 43 major American and Canadian orchestras in 269 of 298 performances), there is no basis for concluding that a monopoly share of these opportunities was occupied by C & A pianos. To define a market which Steinway dominates, one would have to define a market for the supply and service of performance pianos played by Steinway artists performing at concert venues which do not own their own Steinway pianos. This court has substantial doubt that a relevant market can be defined in such a "gerrymandered" fashion.

The court therefore concludes that plaintiff has failed to demonstrate a likelihood that it will succeed at trial in proving a relevant market in C & A pianos and services which Steinway dominates.

b. *Does Steinway's C & A program, or the Steinway dealers who represent it, or the technicians they employ, constitute an essential facility such that if Steinway can deny access to it [them] to a competitor such as Yamaha, competition may be substantially lessened?*

Plaintiff contends that even if "Concert and Artist pianos and services" does not constitute a market, it—or the network of dealers that support it—constitutes an "essential facility," such that Steinway must share access with Yamaha if competition is not to be substantially lessened.

The essential facilities doctrine usually arises in connection with Sherman Act § 2 claims. It imposes a duty, under certain circumstances, upon a monopolist to cooperate or deal with his competitors. A refusal to do so "may be unlawful because a monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Where a monopolist controls an essential facility, the antitrust laws require him to make the facility available to his competitors on non-discriminatory terms. *Id.*

Four elements must be established to make out a case under the § 2 essential facilities doctrine: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Id.* at 1132–1133. *See Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024 (7th Cir.1988). While plaintiff invokes the essential facilities doctrine in its discussion of its Sherman Act § 2 claim (Hendricks' Post–Trial Mem. at 32, *et seq.*), it also contends that it is Steinway's control of an essential facility that renders its "agreement" with its dealers not to deal with Yamaha likely to suppress competition for Clayton Act § 3 and Sherman Act § 1 purposes: that the "agreement" effectively deprives Yamaha of access to the essential facility represented by Steinway dealers. Accordingly, it is appropriate to examine the issue of whether Steinway controls an essential facility—a facility to which a market participant must gain access if it is to have the ability to compete effectively—in the context of analyzing plaintiff's Clayton Act claims.

Plaintiff is not entirely consistent in its identification of the putative essential facility. It argues first that success in the "market for Concert and Artist services" is essential to success in the market for con-

cert grand pianos. (Hendricks' Post–Trial Mem. at 3.) It argues that an essential condition of enlisting artists to join Yamaha's artist roster is being able to assure them of concert service in all major music centers in the United States. (*Id.* at 19.) Hence, plaintiff suggests that the essential facility is a network of dealers who can store the pianos and provide the concert service. (*Id.* at 19.) A network of dealers cannot provide adequate concert service without the services of highly skilled concert technicians, whom plaintiff claims are few in number and employed primarily by Steinway dealers; one becomes a skilled concert technician only with experience, and the best way to obtain concert experience, historically, has been by working on Steinways. (*Id.* at 19.) Elsewhere plaintiff identifies two essential facilities which Steinway controls: "the pool of technicians having the skill and experience needed to enable a competitor to establish a reliable performance service" and "Steinway's near-monopoly of [the] artists themselves, bound to Steinway by long relationships...." (*Id.* at 33.)

The argument, as the court understands it, posits a number of interlocking necessities which plaintiff claims Yamaha must access to challenge Steinway's dominance in the concert grand piano market. Essentially, plaintiff argues that Yamaha cannot effectively sell concert grand pianos on a level competitive with Steinway without artists' endorsements; that Yamaha cannot obtain artists' endorsements without providing Concert and Artist pianos and services; and that Yamaha cannot provide Concert and Artist pianos and services without a network of dealers employing skilled concert technicians to store, maintain, deliver and prepare the pianos. These things are what Steinway has and Yamaha wants, and they constitute the essential core of this case, regardless of the doctrinal trappings in which the parties have dressed them. While the issue is a far from simple one, the court concludes that plaintiff has not satisfactorily established that Steinway's dealers are essential to Yamaha's ability to compete.

(1) If C & A pianos and services represent an essential facility, what market must be looked to to assess the impact on competition of denial of access to that facility?

To prevail on its Clayton Act § 3 claim, Hendricks must show that Steinway's dealership agreement (whether the explicit one requiring its dealers to represent Steinway as "the unquestioned leader" or the tacit one requiring its dealers to represent Steinway's C & A program exclusively) is depriving Yamaha of access to some facility necessary for effective competition. The issue is complicated not only because there is a question as to what constitutes the alleged essential facility but because it is not clear in what product market Yamaha's ability to compete is arguably being injured. While plaintiff must argue that access to Steinway dealers is essential if Yamaha is to compete effectively in selling concert grand pianos (it must argue this because concert grands are the only part of the all-piano market in which Yamaha does not tower over Steinway), the realities of the marketplace suggest that it is not in order to sell concert grand pianos that Yamaha and Steinway compete for artist endorsements.

The evidence establishes clearly that the only market Steinway arguably dominates —the concert grand piano market—is not the arena of competition for which Concert and Artist programs exist. The testimony of both Yamaha's and Steinway's marketing personnel clearly established that the purpose of a Concert and Artist program is, as Yamaha's Terry Lewis said, to "drive all markets for Yamaha pianos and project to the entire line." The testimony of Steinway's Frank Mazurco was in accord. Yamaha decided to develop a Concert and Artist program not to sell concert grand pianos but to differentiate its entire line from Korean "look-alikes." If the entire line is looked to as the arena of competition for which C & A programs are designed, Steinway is a veritable midget and Yamaha a giant, selling seven times as many pianos as Steinway in 1986.

It is not merely that Concert and Artist programs do not exist to sell concert grand pianos. Concert and Artist pianos *compete* with concert grand pianos; if there were no Concert and Artist pianos available, concert halls would be forced to buy concert grand pianos, presumably boosting concert grand sales significantly.

Moreover, the evidence fails to show the requisite nexus between Concert and Artist activities and success in selling concert grand pianos. Comparisons of past sales performance of Steinway and Yamaha are not probative. Terry Lewis frankly acknowledged that a major factor in Yamaha's historically poor showing in concert grand sales was the superiority of Steinway's, Baldwin's and Bosendorfer's instruments.

Nor are current sales probative. Terry Lewis' testimony indicated that most of the CF–IIIs coming into the United States in the next year will be dedicated to C & A use, not offered for sale. Indeed, there was no evidence that Yamaha has had any difficulty selling any CF–IIIs it has imported, even at the CF–III's high retail price. Further, while the evidence established that C & A activities influence the buying decisions of ordinary consumers (who rarely if ever buy concert grand pianos), it does not necessarily follow that such activities influence the buying decisions of buyers of concert grand pianos; it is much more likely that this small and select consumer population is able actually to evaluate the qualities of the competing instruments rather than relying on artists' endorsements.

If Steinway controls an essential facility, it is not a facility that has been shown to be essential to effective competition in the sale of concert grand pianos. The evidence best supports the inference that if the CF–III is in fact qualitatively competitive with the Steinway Model D, and if Yamaha seriously seeks to offer it for sale, it will be able effectively to compete, whether or not Steinway dealers agree to represent Yamaha's C & A program.

The reality of the marketplace must serve as the lodestar. *Hartz Mountain,*

*supra,* 810 F.2d at 805. This dispute is not about sales of concert grand pianos. It is not about any conduct by Steinway which has inhibited efforts by Yamaha to manufacture or sell its concert grand pianos. Rather, this dispute is about whose pianos will be showcased on the classical concert stage, a matter of importance because artist endorsements have a potent impact on sales of the manufacturer's entire line.

(2) Do Steinway's dealers constitute an essential facility?

Assuming for the moment that adequate technicians were otherwise available, the court cannot accept the contention that Yamaha cannot mount a Concert and Artist program without using Steinway dealers. Yamaha has 365 dealers in the United States. Steinway has 110. Of the twenty independent dealers Yamaha chose to approach to represent it in Phase I, eleven are Steinway dealers, four of whom have chosen to represent Yamaha despite Steinway's demand for exclusivity. While being unable to enlist seven of its twenty first-choice dealers is an impediment, the record does not indicate that without these seven dealers, Yamaha cannot with reasonable effort mount an effective C & A program.

As to two of these seven dealers, there has been no showing that the other Yamaha dealer[s] in those dealers' territories cannot adequately service Yamaha's program. Yamaha's dealer selection criteria, in effect if not in intent, are aimed at Steinway dealers. This is not simply because Steinway dealers tend to have excellent in-house technical capacity, but because Yamaha wants dealers with stature, recognition and contacts in the community: goodwill, essentially, developed in large measure because of these dealers' relationship with Steinway. The fact that Yamaha's first-choice dealer in a territory is also the Steinway dealer does not mean that other Yamaha dealer[s] in the area cannot adequately service Yamaha's program while they build their own goodwill and contacts in the community.

Even if competent alternative dealers are not available in some territories, Yamaha is

not foreclosed from developing a C & A program. It can do what it did, for reasons that appear to have nothing to do with Steinway, with Hendricks in Minneapolis: choose a trusted and capable dealer and start a dealership. And, while not as effective in developing a C & A presence in the community, it can provide its concert service at a distance, as it did recently for two Yamaha artists appearing in Ohio. There appear to be only five Phase I territories in which Steinway's policy has caused Yamaha's exclusive dealer to decline to support Yamaha's program, so the coverage problems Yamaha faces do not appear to be insurmountable.

Yamaha is in all likelihood the largest piano manufacturer in the world. It is a major factor in the U.S. piano market. It has demonstrated by engaging in a host of expensive promotional activities in recent years that it has the financial ability to make expenditures in support of its C & A program. The Seventh Circuit has made clear that in the absence of evidence of a monopoly in the relevant market (and the arena of effective competition between the parties, the all-piano market, is not a market in which Steinway is a monopolist), the fact that one manufacturer's lock on extant dealers in a territory causes another manufacturer to move into that territory more slowly than would otherwise have been the case and at somewhat higher cost does not establish a substantial anticompetitive effect. *Roland Machinery Co., supra,* 749 F.2d 380, 394 (7th Cir.1984). *See also Joyce Beverages of N.Y., Inc. v. Royal Crown Cola Co.,* 555 F.Supp. 271, 278–279 (S.D.N.Y.1983).

### (3) Do the technicians employed by Steinway dealers constitute an essential facility?

It is on the issue of Yamaha's lack of access to skilled tuner-technicians if it cannot use Steinway dealers that plaintiff's

essential facilities argument most strongly rests. Plaintiff introduced evidence that technicians, assuming adequate musical training and natural gifts, can develop their skills to a level adequate to meet the exacting demands of concert artists only by actually doing concert-level technical work.[11] The evidence indicated that Hendricks has expended considerable resources to develop the natural gifts of its two concert technicians, and that only one, David Hines, has the fully-developed capacity to take primary responsibility for preparing a concert grand piano for concert performance. The evidence also established that Hendricks is the only Chicago-area piano dealer with concert quality technical services in-house. Moreover, Mr. Hines credibly testified that only two other individuals in the Chicago area have comparable experience in preparing pianos for performances by world-class artists, Tom Porter, Orchestra Hall's staff technician, and Virgil Smith, Mr. Porter's predecessor, who is currently self-employed. (Tr. Jan. 13 at 374.)

Given that even the most knowledgeable musician with a perfect ear and great manual dexterity cannot develop concert-level skills without hands-on experience, and given that historically, most hands-on experience has been obtainable primarily by working on Steinway concert grands, and given that Steinway has required its dealers to have their technicians on staff rather than relying on independent contractors, the inference plaintiff would like the court to draw, that there are not many individuals with Mr. Hines' abilities who are not employed by Steinway dealers, is reasonably obvious. The difficulty arises when one seeks to move from that inference to the one this court believes plaintiff must establish if it is to show that Steinway's policy will significantly inhibit Yamaha's ability to mount a C & A program: that Yamaha cannot with modest effort develop a comparable resource for itself.

---

**11.** It should be clear that all piano dealers must have access to technicians who can regulate and voice; some tuning, regulation and voicing must be done on all new pianos before they can be sold. It is also true, however, that more pre-sale preparatory work is required by Steinway pianos than by Yamaha pianos.

In Yamaha's Phase I, the only phase of its C & A plan concerning which detailed evidence was presented, it already has committed dealer and technical resources in fifteen out of twenty-two major markets. In seven, it has been unable to secure representation from its dealer of choice. There was no evidence as to the availability of technicians in these markets, so the court must necessarily extrapolate from the Chicago area evidence, understanding that each of those seven territories represents a smaller urban center.

In the absence of evidence to the contrary, it is reasonable to infer that there are a number of alternatives to using Steinway's dealers which Yamaha could employ. It could supply these territories with trained technicians, hired away from other employment in the area (from the Steinway dealer, for instance) or relocated from elsewhere, either permanently or on an as-needed basis. Mr. Hines, whom the court found to be a very impressive witness and whose high level of talent and skill the court accepts without reservation, is not paid an extravagant salary. (Tr. Jan. 13 at 379.) It is difficult to believe that Yamaha or its dealers, with modest expenditures, could not quickly become serious competitors in the market for purchasing technical services.

Moreover, it was established that Mr. Hines regulates and voices Orchestra Hall's C & A Steinway piano only twice a year, with occasional additional adjustments as needed. Mr. Hines is not regularly "on-site" at Orchestra Hall. The tuning that is done regularly is not a skill in scarce supply. The court sees no reason why the technicians employed in Yamaha's fifteen committed territories, or Yamaha's own staff technicians, could not easily handle the remaining seven territories' needs, while training local technicians, until the local technicians had enough hands-on experience to take over the work themselves. The evidence was clear that competent piano tuners and technicians exist in abundance. What is in short supply is persons who have hands-on classical concert preparation experience. With a modest investment in training and supervision, Yamaha can surely develop all the technical support it and its dealers need.

The problem Yamaha faces is at worst a temporary one. Defendant introduced substantial evidence that the Chicago area is full of excellent technicians who have simply not had the exposure Mr. Hines has had to classical concert technical work. Some, like Brian Mott, have substantial experience with popular and jazz concert work and with Yamaha pianos. Mr. Mott has even done classical concert technical work on Bosendorfer pianos. While Mr. Mott does not have as much classical experience as Mr. Hines does, it appears clear that he needs only the opportunity to acquire it. There is no reason to believe that there are not many technicians throughout the United States who have developed their skills doing Bosendorfer and Baldwin classical concert work, and jazz and popular concert work, who could, with a little training, and a little opportunity to work with classical performance artists, in a short space of time fully meet Yamaha's needs. Steinway and its dealers have invested in persons like Mr. Hines. It is not unreasonable to expect Yamaha and its dealers to do the same.

In short, this court is not persuaded that technicians employed by Steinway dealers constitute an essential facility, either in the sense that they constitute a facility which Yamaha is unable practically or reasonably to duplicate or in the sense that without access to them, competition by Yamaha will be substantially lessened. Yamaha's program may develop somewhat more slowly or perhaps at somewhat greater cost than if Yamaha could simply commandeer Steinway's dealer network, but this court is persuaded that the task is not nearly as onerous as plaintiff would suggest, and that Yamaha has the resources to accomplish it. Competition will surely be served rather than disserved thereby, since there will be competing C & A representatives in

music markets throughout the country as well as competing opportunities for skilled technicians, creating the possibility that more people will have the opportunities which Steinway and Hendricks have given to Mr. Hines.

### 3. Effect of the agreement on competition in the Chicago area

The court has been looking, heretofore, at the impact of Steinway's conduct on Yamaha in a nationwide geographic market. The more immediate issue this case presents is the impact of Steinway's conduct on Hendricks, who will be terminated as a Steinway dealer if the termination is not enjoined.

It is well-established that the antitrust laws are concerned with injuries to competition, not with injuries to individual competitors. *Roland Machinery Co., supra,* 749 F.2d at 394. The effect of Hendricks' termination by Steinway, whatever its impact on Hendricks, is unlikely to be anticompetitive as far as the Chicago area is concerned.

While the court does not wish to exaggerate the importance of a bit of good-natured testimony, given essentially with tongue-in-cheek, there is surely a relevant insight in Mr. Hendricks' response to the question of why he was willing to jeopardize his relationship with Steinway to take on Yamaha's C & A program: if there was going to be a competing Concert and Artist program in the Chicago area, he wanted it to maintain his position in Chicago "as the premier supplier of fine, well-prepared concert grand pianos." He stated, "As a competitor I didn't want to see it go to any of my buddies." (Tr. Jan. 11 at 88.)

The fact is that the introduction by Yamaha of a Yamaha C & A program in Chicago will, if Hendricks cannot represent both Yamaha's and Steinway's programs, result in the existence of two competing C & A dealers. This will not only give artists a choice of dealers, along with a choice of pianos, but it will create real competition for the placement of C & A pianos at musical events, competition that would not exist if Hendricks controlled both programs. One does not need much of an imagination to see how two competing dealers, with superior concert instruments to "lend" to the public, could develop and generate musical opportunities; that the public would reap the benefit is clear.[12]

Having Yamaha's and Steinway's major promotional programs in competing dealerships will almost certainly result in the more vigorous promotion of each program. It will also reduce the "free-riding" on the Steinway name that indisputably exists in this industry. Steinway has obviously made a business decision in the past that it is willing to allow its dealers to sell other brands, even though the sales of those brands benefit from Steinway's advertising and reputation. That it does not wish to give this free ride to Yamaha, in dealerships spearheading Yamaha's attack on Steinway's reputation for classical concert preeminence, is, to this court's mind, legitimate pro-competitive behavior.[13] With both manufacturers vigorously represented by competing dealers in a major market

---

**12.** The court cannot rule out the possibility that there are cities in the United States too small to provide opportunities for, and receive the benefit from, two competing C & A programs. But if there are such places, Chicago is not one of them.

**13.** Plaintiff argues that the "free ride" issue is irrelevant since Steinway has not prohibited its dealers from selling Yamaha pianos but only from representing Yamaha's C & A program, and that the Yamaha C & A program is no more the beneficiary of any free-riding that exists than Yamaha pianos have historically been. This is not the case. Mr. Lewis' testimony made

clear that in selecting its C & A dealers, Yamaha looked for, among other things, dealers with standing, reputation and connections in the local musical community that would make them able to "hit the ground running" in placing Yamaha's C & A pianos. By Mr. Hendricks' own testimony, his standing in this musical community is largely due to his affiliation with Steinway and to the prestige of the Steinway name. Hence, the goodwill that Steinway has created for its dealers is precisely what Yamaha would like to capitalize on in developing its C & A program.

like Chicago, and with each manufacturer responsible for promoting its own line and its own dealer, the most likely effect is expansion of piano sales and the creation of a larger and more vigorous marketplace.

In sum, the court concludes that plaintiff has not shown that Steinway's conduct will impair competition by Yamaha generally or in the Chicago area. Plaintiff has therefore not established a likelihood of success on the merits with respect to its claim under § 3 of the Clayton Act.[14]

### B. *Sherman Act, § 1*

To make out a violation of § 1 of the Sherman Act, plaintiff must demonstrate the existence of a relevant market, and the existence of a contract, combination in the form of trust or otherwise, or conspiracy which has the effect of foreclosing competition in a substantial share of the relevant market. *See Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir.1980); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). The court is not limited to looking at the effect of the single contract between the plaintiff and the defendant but may look to the entire "pattern of contractual relations" that the defendant maintains. *Twin City, supra*, 676 F.2d at 1303.

Plaintiff has made no suggestion that its claim under § 1 of the Sherman Act can stand if its Clayton Act § 3 claim fails. While for reasons set forth above, this court finds that plaintiff will in all likelihood be able to satisfy the "contract" element of this offense, it does not find that Steinway's dealer agreement will—even if Yamaha cannot achieve representation of its C & A program by any Steinway dealer —have the effect of foreclosing competi-

tion in a substantial share of the market that is affected by the C & A program: the market for the manufacture and sale of all acoustic pianos. Further, even if the market for the manufacture and sale of concert grand pianos is viewed in isolation, the evidence presented is inadequate to demonstrate that Yamaha will be significantly hindered from challenging Steinway's lawfully-acquired market dominance in this market since Yamaha has the capacity to develop an independent dealer network and adequate supporting technical services.

Accordingly, the court concludes, as it concluded with respect to plaintiff's Clayton Act § 3 claim, that plaintiff has not demonstrated a likelihood that it will succeed on the merits of its claim that defendant has violated § 1 of the Sherman Act.

### C. *Sherman Act, § 2*

The offense of monopolization under § 2 of the Sherman Act requires proof of monopoly power "plus conduct designed to maintain or enhance that power improperly." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 373 (7th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). The offense of attempted monopolization, also made unlawful by § 2, requires a showing of (1) a specific intent by the defendant to destroy competition (meaning an intent to restrain competition unreasonably, not merely an intent to prevail over one's rivals), (2) predatory or anti-competitive conduct undertaken by the defendant to accomplish that unlawful purpose and (3) a dangerous probability of success. *Hartz Mountain, supra*, 810 F.2d at 801. Section 2 reaches the conduct of a single firm and is unlawful only where actual monopolization is threatened. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752,

---

**14.** While plaintiff has asserted a tying agreement claim, it does not appear to press that claim, at least not in any conventional sense. As the court understands the claim, the tying product alleged is concert grand pianos while the allegedly tied product is Steinway's C & A program. Inasmuch as the evidence is clear

that Hendricks *wants* to represent the Steinway C & A program (as well as Yamaha's program), the court sees no way in which such a claim can succeed. *See, e.g., Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

767, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984).

The court is persuaded that here, as in dealing with plaintiff's Clayton Act § 3 claim, sound analysis requires the most careful scrutiny of the interrelationship among the various markets and submarkets involved. The court has determined that plaintiff has shown a likelihood of success on the merits with respect to its contention that defendant has a lawfully-acquired market share of approximately 50% of the market for concert grand pianos. This market share is, as was noted above, sufficient to permit an inference of market power, particularly in light of the fact that there are no close rivals. *See Valley Liquors, supra,* 822 F.2d at 666–667. But is this market power the source of any power on Steinway's part to exclude competition? Specifically, is Steinway's market power in the sale of concert grand pianos the source of its ability to persuade its dealers not to take on Yamaha's C & A program? This court thinks not. A Steinway dealer is fortunate if he sells one concert grand piano a year. The evidence indicates that few sell that many. It is hard to believe that a dealer's profits from the sale of one concert grand piano a year translate into power on Steinway's part to induce its dealers not to deal with Yamaha.

Apart from whatever influence on its dealers Steinway may have by virtue of its share of the concert grand piano market, there is little else in the record to suggest that its share of the concert grand piano market gives it market power. There is nothing in the evidence to suggest that Steinway has done anything (or can do anything) to impede Yamaha's ability to capture a share of the concert grand piano market, once Yamaha offers for sale a competitive instrument. The evidence indicates that Yamaha has to date imported few CF–IIIs into the United States for sale. There is no evidence that Steinway has attempted to discourage its dealers from selling the CF–III. All the evidence indicates that the concert grand piano market

is a market with insignificant barriers to entry. There are no patents, materials are easily available and the instruments can be made and sold even by solitary individuals. Even if Steinway has a large enough share of this market to be viewed as having a monopoly, there is no indication that it has the power (or is likely to get it) to control prices or exclude competitors. Without such a showing, there can be no § 2 violation. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

The fact is that the source of any "market power" Steinway has is not its putative monopoly share of the market for the sale of concert grand pianos. It is its name. The power of that name derives from Steinway's historic superiority and from its artists roster. Under unusual circumstances, the uniqueness or desirability of a particular product can establish the defendant's market power independently of its market share. *See Microbyte Corp. v. New Jersey State Golf Ass'n,* 1982–2 Trade Cases (CCH), ¶ 67, 228 (D.N.J.1986) at 61,163 [available on WESTLAW, 1986 WL 7231]. *See also Fishman v. Estate of Wirtz,* 807 F.2d 520, 540 (7th Cir.1986). There is no offense under § 2, however, unless actual monopolization is threatened. *Copperweld, supra,* 467 U.S. at 767, 104 S.Ct. at 2739–40. Just as the source of any "market power" Steinway may have derives from its name, not from its dominant position in the sale of 9 foot pianos, so its dealer restrictions are neither intended nor likely to prevent meaningful competition in the sale of concert grands. Rather, those restrictions are intended to protect an image which has allowed Steinway to maintain its less than 2% share in the market for all acoustic pianos. Given Steinway's modest success in this market without a Yamaha C & A program challenging its unique image, this court sees little danger of monopoly here.

There are many cases which indicate that a market share below approximately 20% cannot, as a matter of law, establish mo-

nopoly power. *See Valley Liquors, supra,* 822 F.2d at 666–667 (and cases cited therein). The concept that a 1.75% market share can do so is, in this court's view, totally untenable. But even assuming (1) that the special characteristics of the piano market, and the special status Steinway enjoys and shares with its dealers, give it "market power" irrespective of its market share, and (2) that it is such market power that Steinway has used to induce its dealers not to handle Yamaha's C & A program, and (3) that the purpose of such inducement was to avoid losing some of its market power to a competitor, a likelihood of success on the merits of the § 2 claim has not been established for two reasons.

First, for reasons set forth above, Steinway's "market power"—its putative power to induce its dealers to refuse to deal with Yamaha's C & A program—cannot exclude Yamaha from mounting its own C & A program. Since "monopoly power" means the power to control prices or exclude competition, *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), Steinway has not been shown to possess it. Second, Steinway's conduct has a legitimate business justification. "[T]he desire to maintain market power—even a monopolist's market power —cannot create antitrust liability if there was a legitimate business justification" for its conduct. *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 368 (9th Cir.1988). *See General Industries Corp. v. Hartz Mountain, supra,* 810 F.2d at 804. *See generally Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 597, 608, 105 S.Ct. 2847, 2860, 86 L.Ed. 2d 467 (1985).

Steinway argues that the existence in one dealership of two competing C & A programs creates a conflict of interests and that it is therefore justified in its insistence that its dealers represent the Steinway C & A program exclusively. Hendricks claims that this is a pretext in that Steinway has never terminated dealers who handled Baldwin's C & A program, that there is no real conflict of interests anyway and that any conflict of interests that arguably exists arises not from the presence of both C & A programs in one dealership but from the fact that Yamaha has a C & A program.[15] The court finds Steinway's position more persuasive.

The evidence indicates that Steinway did once terminate a dealer for handling Baldwin's C & A program, but it has not taken similar action in recent years because the Baldwin program is too insignificant to be deemed to be in competition with Steinway's. The court fully accepts as true Steinway's explanation for its apparent inconsistency with respect to Baldwin: Steinway is concerned that dealers face a conflict in handling multiple C & A programs that involve significant promotional efforts, not in handling C & A programs that involve only an occasional concert service.

The conflict which this court believes exists arises not only from the manner in which the dealer promotes sales of the manufacturer's line of pianos, but also from the efforts with which it promotes the use of C & A instruments generally. This has been discussed in detail in the court's findings of fact and need not be repeated here. Suffice it to say that for both Steinway and Yamaha, C & A instruments are consigned to the dealer to use in the marketplace to get the manufacturer's name before the public in the most complimentary circumstances. Opportunities to showcase the pianos must be developed and the instruments deployed. The conflict is clear. If a local concert hall or university is having a musical event and needs a piano, whose piano will Hendricks seek to place there? While assuming that the integrity of Hendricks and its technicians will ensure to both manufacturers excellent concert service, concert service is but a

---

**15.** Plaintiff suggests that the mere existence of a Yamaha C & A program will create the putative conflict of which Steinway complains whenever a dealer sells both Steinway and Yamaha pianos. Hence, plaintiff argues, Steinway's exclusivity policy with respect to C & A programs is a veiled exclusive dealing policy.

small part of what the Yamaha and Steinway C & A programs are about. Exploiting promotional opportunities in which C & A pianos can be used creates a conflict for a dealer representing two competing C & A programs. The conflict arises directly from the existence of two C & A programs in one dealership.

Even in terms of dealing with ordinary piano consumers, the existence of two C & A programs in one dealership creates a significant conflict. A Steinway dealer can easily argue the special superiority of the Steinway even though he sells Yamaha pianos and despite the existence of a Yamaha C & A program and a roster of Yamaha artists. But if that dealer is providing concert service for those Yamaha artists and promoting Yamaha C & A pianos for use at major public events, it is difficult to see how he can argue Steinway's superiority with any persuasiveness.[16] Further, instruments which are to be promoted to the public as concert instruments must be shown—on the showroom floor—in a manner which suggests the concert hall. Concert-oriented promotions for Steinway and Yamaha in one dealership will create a very concrete conflict—a conflict for space and a conflict for the consumer's attention.

Steinway may or may not be about to face the most significant competitive threat of its recent history. This court has no difficulty concluding that it is legitimately entitled to be able to depend on its dealers to fight its fight with intense vigor, and that it was legitimately entitled to conclude that a dealer representing both combatants could not be relied on to do so.

## II. IRREPARABLE INJURY TO HENDRICKS

Irreparable injury is easily demonstrated in most dealer termination cases, and this case is no exception. Hendricks' entire business and reputation have been built around the Steinway line. Steinway piano sales accounted for over 40% of Hendricks' dollar volume last year, and loss of its Steinway dealership will cause an unquantifiable loss of sales of Yamaha and Samick pianos because of loss of the drawing power of the Steinway name. It is extremely unlikely that Hendricks will, faced with this loss of sales, be able to sustain its four retail locations and 32 employees. Losing locations and employees represents more than merely the diminution of a business which has previously experienced fourteen years of uninterrupted growth; it will mean the loss of expensive facilities developed at Hendricks' expense to promote the Steinway line and the loss of employees carefully trained at Hendricks' expense for the exacting technical demands of Steinway pianos in general and Steinway's C & A program in particular. It will mean an invaluable loss of goodwill. The drawing power of the Steinway name is so significant, and the prestige it confers on a dealer so substantial, that its withdrawal will be interpreted broadly in the musical community as Steinway's expression of "no-confidence" in Hendricks; indeed, competing dealers are already using the termination to attack Hendricks' standing in just this way. A business so damaged in sales, facilities, personnel and reputation cannot adequately be made whole by an award of money damages at the end of this litigation.

The court does not believe, however, that loss of its Steinway dealership will put Hendricks out of business. Hendricks has not suggested that it will. Indeed, in Minnesota, where Hendricks will not carry Steinway pianos, Mr. Hendricks testified that he is confident that he will eventually have a profitable business.

---

16. One need only consider the New York Times' review of Andre Watts' twenty-fifth anniversary concert, performed in New York during the hearing on plaintiff's motion. The review praised Mr. Watts but found fault with his CF–III. A Steinway dealer could easily exploit this review in trying to persuade a consumer of Steinway's superiority. A Steinway dealer carrying Yamaha pianos could also do so. But could a dealer responsible for promoting Yamaha as an instrument worthy of the classical concert stage do so? In this court's view, the answer is no, at least assuming the dealer cared to be viewed by his customers as possessing any integrity at all.

There is no suggestion that without Steinway, Hendricks will become insolvent or unable to finance this litigation. There is no suggestion that Steinway will be unable fully to respond in damages should plaintiff prevail at trial. But it is clear to the court that loss of its Steinway dealership will irreversibly change Hendricks' business, substantially diminish it and damage it in ways that are not susceptible to quantification. Moreover, the loss of highly trained personnel and the injury to goodwill which Hendricks will sustain are not likely to be easily remediable. Accordingly, the court concludes that plaintiff has satisfied its burden of demonstrating substantial, irreparable injury.

## III. INJURY TO STEINWAY AND THE BALANCE OF HARMS

It is clear from the evidence in this case that the piano business is highly competitive. Manufacturers depend on their dealers to advance their position in the marketplace. In Steinway's case, this means much more than merely promoting its pianos on the sales floor. It means providing absolutely reliable, attentive, first-rate technical support for Steinway artists. It means promoting the Steinway name by aggressive and energetic efforts to promote and place Steinway C & A pianos. And it means complete loyalty and commitment to the Steinway name and image. A piano is not an earthmover, but an instrument of artistic expression; a dealer that is doing its job well must be able to sense and speak to the customer's personal tastes and preferences. Given the subtle and subjective factors which inform a buyer's choice of a piano, the manufacturer is highly dependent on the dealer's creativity, loyalty and commitment in promoting the manufacturer's interests.

Because of the competitiveness of the industry, the importance of the dealer in the manufacturer's success, and the abilities, loyalty and commitment required of a dealer, Steinway's dealership agreements are terminable at will on 60 days notice.

The preliminary injunction, if granted, would freeze Steinway "into an intimate and continuous relationship with a dealer it no longer wishes to be associated with." *See Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir.1979). Depriving a manufacturer of the right "to use its own judgment with respect to those whom it wishes to appoint as its dealers" constitutes a great hardship. *Id.*

Steinway's problem, however, is not simply that it faces being tied into an irrevocable dealership with a dealer with whom it no longer wishes to do business. Its problem is that it faces such a possibility in the third most significant music market in the nation, under circumstances in which it needs, perhaps as never before, its dealer's undivided loyalty and commitment, and when it has a very sound basis for believing that it cannot get that undivided loyalty and commitment from Hendricks.

What Steinway desperately needs, as Yamaha begins its advance on the concert stage, is dealers who will respond aggressively to this competitive threat, exploiting information about Steinway's historic superiority and high preference factor among major artists, and energetically and creatively promoting Steinway's C & A program, taking maximum advantage of any and all opportunities to showcase Steinway's C & A pianos.

Steinway cannot realistically look to Hendricks for this kind of assistance. Not only is Hendricks committed to promoting Yamaha's C & A program, in direct competition with Steinway for showcase opportunities and for the public perception of its concert preeminence, but Hendricks' self interest, whether based on its fledgling Minneapolis Yamaha dealerships, or the possibility that it will ultimately fail in this litigation, or the possibility that it may succeed and still be terminated, dictates that Hendricks do what it can to ensure that Yamaha is the greatest possible success. Hendricks' future in Minneapolis, and possibly its future in Chicago, lies with Yamaha, and common

sense dictates that Hendricks must build its Yamaha line into the flagship of its enterprise, a position previously held by Steinway.

The court is not left merely to infer that common sense will lead Hendricks to ally itself with Yamaha. The existence of that alliance has been established. Yamaha is actively involved in launching Hendricks into the Minneapolis market, where Hendricks will compete with the local Steinway dealer, supporting Hendricks with cash, extremely favorable credit terms and assistance in promoting Yamaha's presence in the musical community. Hendricks is dependent on Yamaha for the success of this venture and cannot afford to alienate Steinway's chief competitor.

This court considers this dependence of Hendricks on Yamaha to be of greater importance in evaluating Steinway's potential injury than the fact that Yamaha is contributing modest financial support to Hendricks in this litigation. Nevertheless, these factors, coupled with Hendricks' willingness to risk its relationship with Steinway to take on Yamaha's C & A program, demonstrate that Steinway cannot rely on Hendricks for the kind of loyalty and commitment it is reasonably entitled to demand.

In the three or four years this litigation may require to reach finality, the battle between Yamaha's CF–III and Steinway's concert grand for the hearts, minds and loyalty of the nation's concert artists and of the musical public may well be substantially fought. It will be fought, to a significant extent, at the dealership level, where the energy, creativity and aggressiveness of the dealer will be an essential determinant of each manufacturer's goodwill and ultimate competitive standing. If Steinway is deprived of an unquestionably loyal and committed dealer in its major independent market during this time, it is clear that it will face incalculable and irreparable injury.

Considering the respective hardships faced by the parties, the court is inclined to view Steinway's as potentially more significant and less susceptible to being ameliorated by means of a bond or other monetary relief. With adequate money damages, Hendricks' business might be rebuilt. It will not fail in any case, not even in Chicago, and Steinway's termination will not hurt Hendricks at all in Minneapolis. Steinway made its position with respect to the Yamaha C & A program very clear to Hendricks during many months of discussions, and Hendricks chose to go forward with Yamaha. Hendricks had to be aware that Steinway might ultimately act upon its threat, and Hendricks presumably made a business judgment that this was a risk it could afford to run.

If Yamaha succeeds in persuading the public that Steinway is not "the unquestioned leader," Steinway will have lost, irrevocably, the reputation that in all probability has kept it alive as a competitor in the overall piano market. Its injury will be overwhelming in significance, irreparable in nature and wholly incalculable. Accordingly, while both parties face irreparable injury, the court finds that the balance of hardships tilts against the grant of a preliminary injunction in this case.

## IV. THE PUBLIC INTEREST

The public interest in a case such as this is served if the action the court takes in response to plaintiff's motion is best calculated to subserve the antitrust laws' goal of protecting competition.

While in this court's view, plaintiff has failed to demonstrate a likelihood of success on the merits, it has clearly demonstrated a fair ground for litigation. This is essentially a non-price vertical restraint case and a decision on the merits will require a searching inquiry into the reasonableness of Steinway's restriction on its dealers in light of the competitive situation in the piano industry as a whole and in its submarkets, if any are found to exist. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51–59, 97 S.Ct. 2549, 2558–62, 53 L.Ed.2d 568 (1977).

Where there is no clear balance of hardships favoring the entry of a preliminary injunction, the plaintiff cannot prevail

merely by showing that it has raised a substantial question about the legality of defendant's conduct. *See Roland Machinery Co., supra,* 749 F.2d at 392. Such a showing is more clearly inadequate here, where there is substantial reason to believe that Steinway will be more seriously and irreparably injured by the erroneous entry of a preliminary injunction than Hendricks will be injured if preliminary injunctive relief is wrongfully withheld.

### CONCLUSION

Accordingly, this court recommends that the foregoing recommended findings of fact and conclusions of law be adopted by the district court and that plaintiff's motion for a preliminary injunction be denied.

Counsel are given to and including April 29 to file exceptions to this Report and Recommendation with the Honorable William T. Hart. Responses to objections may be filed on or before May 6.

Respectfully submitted,
/s/ Joan B. Gottschall
JOAN B. GOTTSCHALL
United States Magistrate